UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
UNITED STATES OF AMERICA


                    --against--

                                                    17 Cr. 228 (DRH)

ELVIS REDZEPAGIC
                              Defendant
-----------------------------------------------------------------------X


## DEFENDANT'S MOTION TO SET BAIL WITH REASONABLE CONDITIONS OF RELEASE

## INTRODUCTION

Defendant ELVIS REDZEPAGIC moves the Court for an order granting his release or, in the alternative, a bail hearing to be held as soon as possible.  Mr. Redzepagic, who is a pretrial defendant currently detained at the Metropolitan Correctional Center (MCC) in Manhattan is at risk of contracting COVID-19, a dangerous illness spreading rapidly across the world and especially through New York City and State. The suspension of counsel visits at MCC has effectively denied Mr. Redzepagic access to counsel and prevents him from being able to participate in preparing a defense for trial. It is submitted that Mr. Redzepagic does not present any significant danger to the community or risk of flight and that his return to court can be ensured by appropriate conditions of release.

The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).  It is respectfully submitted that Mr. Redzepagic should be released because of the increasingly dangerous public health crisis that imperils his physical health [*See* 18 U.S.C. § 3142(g)(3)(A) (listing a person's

1

"physical and mental condition" as one of the release factors to be considered in a bail application)] combined with the ongoing denial of access to counsel occasioned by the prohibition on counsel visits at MCC.

The conditions at MCC, as described in detail below, necessitates at least temporary release on bail until this pandemic has ended. The health risk to Mr. Redzepagic in particular is heightened because he was recently diagnosed with active tuberculosis (TB) having previously been a latent TB carrier. Being that TB and Covid-19 both impact the lungs, any existing damage to Mr. Redzepagic's lungs from TB would make him particularly vulnerable should he contract Covid-19.

It is requested that during the period of release, Mr. Redzepagic be required to reside with his parents and siblings at their house in Suffolk County under electronic monitoring and any other conditions that the court deems appropriate.

## **FACTUAL BACKGROUND**

On March 11, 2020, the World Health Organization officially classified COVID-19, a new strain of coronavirus, as a global pandemic.[1] On January 21, 2020, Washington State announced the first confirmed case of coronavirus in the United States.[2] Only two months later, COVID-19 has infected over 33,018 people across the United States, leading to at least 428 deaths.[3]

The exponential rate of coronavirus infection is unparalleled. The first case of coronavirus in New York State was announced on March 1, 2020. Less than two weeks later,

---

[1] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.

[2] *First Patient With Wuhan Coronavirus Is Identified in the U.S.*, The New York Times (Jan. 21, 2020), at https://www.nytimes.com/2020/01/21/health/cdc-coronavirus.html.

[3] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (Mar. 21, 2020), at https://nyti.ms/2U4kmud (updating regularly).

New York State reported 325 positive cases. To date, the state has amassed 15,168 confirmed cases of the virus, with 114 deaths.[4] In a five-day period between March 15 and March 20, New York State experienced a 1,064% increase in new confirmed cases of COVID-19.[5] As of March 21, 2020 in New York City, there are 8,115 positive cases and 60 deaths resulting from the virus.[6] Ten days ago, New York City had only 53 confirmed cases.[7] New York now has more confirmed cases of coronavirus than any other state in the country. In fact, New York has over 5% of coronavirus cases nationwide.[8] And the majority of those cases are in New York City, making it an epicenter of the pandemic.[9]

In response to this public health crisis, Governor Andrew Cuomo declared a State of Emergency in New York State on March 7, 2020.[10] Mayor Bill de Blasio declared a State of Emergency in New York City on March 12, 2020, banning gatherings of over 500 people.[11] On March 20, 2020, Governor Cuomo directed all non-essential workers to work from home, requiring individuals to maintain 6 feet of distance between each other.[12] The same day, the

---

[4] *Id.*

[5] *Watch How the Coronavirus Spread Across the United States*, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/interactive/2020/03/21/us/coronavirus-us-cases-spread.html.

[6] *Coronavirus*, New York City Health (Mar. 21, 2020), at https://on.nyc.gov/39ME7wU (updating regularly).

[7] *Id.*

[8] *Coronavirus Live Updates*, The New York Times (Mar. 22, 2020) at https://www.nytimes.com/2020/03/22/world/coronavirus-updates-world-usa.html (updating regularly).

[9] *Coronavirus in N.Y.C.: Region Is Now an Epicenter of the Pandemic*, The New York Times (Mar. 23, 2020), at https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html?action=click&module=Spotlight&pgtype=Homepage.

[10] *At Novel Coronavirus Briefing, Governmor Cuomo Declares State of Emergency to Contain Spread of Virus*, New York State (Mar. 11, 2020) *at* https://on.ny.gov/2TKzIoz.

[11] *DeBlasio Declares State of Emergency in NYC, and Large Gatherings Are Banned*, The New York Times (Mar. 12, 2020).

[12] *Novel Coronavirus (COVID-19),* New York State Department of Health (Mar. 21, 2020), at https://on.ny.gov/2vfFQvy (updating regularly).

Federal Emergency Management Agency (FEMA) declared New York "a major disaster."[13]

a. *Conditions of pretrial confinement create the ideal environment for the transmission of coronavirus.*

"Prisons are petri dishes for contagious respiratory illnesses."[14] Inmates cycle in and out of Bureau of Prisons (BOP) pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening or testing. On March 21, 2020, an inmate at Metropolitan Detention Center (MDC) tested positive for the coronavirus.[15] The individual "complained of chest pains on Thursday, a few days after he arrived at the facility."[16] When he first arrived at the facility, according to authorities, he was asymptomatic. The effect on the population at MDC remains to be seen, but as the chief physician at Rikers Island cautioned, "A storm is coming."[17]

Given what we know about COVID-19, the BOP's quest to contain the infection seems futile. Coronavirus is highly contagious. On average, one person with the coronavirus will infect between two to three other individuals.[18] But public health experts agree that incarcerated

---

[13] President Donald J. Trump Approves Major Disaster Declaration for New York, FEMA (Mar. 20, 2020), at https://www.fema.gov/news-release/2020/03/20/president-donald-j-trump-approves-major-disaster-declaration-new-york.

[14] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. *See also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[15] *1st fed inmate tests positive for coronavirus*, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

[16] *Id.*

[17] *'A Storm Is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jails*, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html.

[18] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more*

individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[19]

Internationally, prisons have proven ripe for the rapid spread of COVID-19. In China, officials confirmed 500 cases of coronavirus in prisons.[20] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[21] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[22]

On March 20, 2020, the New York City Department of Correction announced that one inmate and seven staff members in the city jails had been diagnosed with coronavirus.[23] One day later, on March 21, 2020, it became clear that no fewer than 38 people have tested positive.[24] At least 58 additional people are being held in contagious disease and quarantine units in the city's

---

*contagious than flu*, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[19] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

[20] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020), at https://bit.ly/2vSzSRT.

[21] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020), at https://apnews.com/af98b0a38aaabedbcb059092db356697.

[22] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020), at https://cnn.it/2W4OpV7.

[23] *38 positive for coronavirus in NYC jails, including Rikers*, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

[24] *Id.*

jail system.[25] But the cases are not abating. The chairwoman of the New York City Board of Correction urged, "The best path forward to protecting the community of people housed and working in the jails is to rapidly decrease the number of people housed and working in them."[26]

b.  *The MCC remains unprepared for a coronavirus outbreak.*

Inmates at the MCC—a massive pretrial detention facility housing approximately 700 people—are at serious risk of contracting the virus.[27] The medical care at the MCC has repeatedly failed to adequately address even routine medical conditions. In times of crisis, the medical care at the facility has halted entirely.[28]

On March 13, 2020, nearly two weeks after the first confirmed case of coronavirus in New York State, the Bureau of Prisons announced a 30-day suspension of all visits to all federal correctional facilities. But prohibiting visits to correctional facilities is insufficient to stem the spread of illness. "[T]here is no way to stop the daily flow of guards, teachers, food service and healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic."[29]

Because there is currently no vaccine or cure for COVID-19, the primary focus is on preventing the spread of the virus. With each new arrest comes increased risk of spreading the

---

[25] *Id.*

[26] *Id.*

[27] *See* Exhibit A, Affidavit of Jonathan Giftos, M.D.

[28] During a recent eight-day lockdown at the MCC, inmates on one unit reported having been forced to share one toilet, one shower, and one sink among twenty-six people, and were prevented from washing their clothing: prime conditions for the spread, rather than containment, of infectious disease. On other units, toilets overflowed in two-man cells, spreading raw sewage. Inmates with serious medical conditions, including AIDS and anemia, were denied medications or medical care. Female inmates were denied feminine hygiene supplies. No clean drinking water was provided; inmates were forced to drink from their bathroom sinks, from which brown water often ran.

[29] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

6

virus in MCC. Individuals who are newly arrested and potentially exposed to coronavirus, if they are not symptomatic, will be brought into the facility. There, they are held with the existing population, potentially transmitting COVID-19 to a populace held in close quarters with unsanitary conditions. These conditions are ripe for the spread of infection: The individual who tested positive for coronavirus at the MDC on March 21 first became incarcerated only a few short days before becoming symptomatic.[30]

Notwithstanding a confirmed case of coronavirus at MDC, the MCC remains unprepared for an outbreak. The facility does not currently have the ability to test for coronavirus and there are no general screening protocols in place. Only if an inmate self-reports symptoms will they be screened for the virus. If symptomatic, the inmate will be "isolated" in their cell, exposing their cellmate to risk. The MCC has only thirty N-95 masks and no one, including correction officers, is allowed to have hand sanitizer because it is alcohol based. The use of gloves remains discretionary among officers.

Given what we know about coronavirus, conditions of confinement generally, and the lack of preparedness at the MCC, the fact that there are no confirmed cases of COVID-19 to date at the MCC reflects the fact that the MCC lacks the ability to test for the virus. It does not mean that no one in the facility is infected.

c. ***The federal judiciary has begun to set bail conditions for previously detained individuals in light of the coronavirus.***

The judiciary has recently begun to recognize and address this exceptional crisis. On March 12, 2020, Magistrate Judge Orenstein denied a remand application, holding that increasing the population of the Metropolitan Detention Center could present a "danger to the

---

[30] *1st fed inmate tests positive for coronavirus*, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

community"—the staff and inmates inside the jail—by potentially bringing the virus into the facility. *United States v. Raihan*, 20-CR-68 (BMC) (Mar. 12, 2020). A week later, conditions worsened exponentially.

On March 19, 2020, thirteen days after having remanded defendant Dante Stephens, Judge Nathan reversed herself "in light of circumstances that have changed since the March 6 hearing," namely, "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic." *United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020). In setting bail, Judge Nathan noted that "[a] comprehensive view of the danger the Defendant poses to the community requires considering all factors," including COVID-19. *Id.* Similarly, on March 19, 2020, the threat of coronavirus led Judge Ramos to release a formerly detained individual on bail. *See United States v. Santiago Ramos*, 20-CR-04 (ER).

In the throes of this public health crisis, the Court must release Elvis Redzepagic to protect his physical health.

## **LEGAL ARGUMENT**

### I. **The Sixth Amendment demands Mr. Redzepagic's release.**

The conditions of confinement at the MCC have essentially deprived Elvis Redzepagic of his Sixth Amendment right to the effective assistance of counsel. Until he is released, Mr. Redzepagic will continue to suffer violations of his constitutional rights.

The Sixth Amendment right to counsel is the cornerstone of our adversarial system of criminal justice. "The right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system." *Federal Defenders of*

8

*New York, Inc. v. Bureau of Prisons*, Docket No. 19-1778 (2d. Cir. Mar. 20, 2020). In recognition of this vital right, BOP regulations instruct that detention center wardens "*shall provide* the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis." 28 C.F.R. § 551.l 17(a) (emphasis added).

A detention facility therefore violates the Sixth Amendment when it "unreasonabl[y] interfere[s] with the accused person's ability to consult counsel." *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001). Unreasonable interference requires a showing far less alarming than the one present here. In *Benjamin,* the Second Circuit held that New York City correctional facilities violated the right to counsel when defense attorneys "routinely face[d] unpredictable, substantial delays in meeting with clients" and were "forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client." 264 F.3d at 179.

On March 13, in response to the public health crisis posed by COVID-19, the BOP issued a notice that all visits in all federal correctional facilities would be suspended for at least 30 days. In the likely event that someone at the MCC tests positive for coronavirus, the entire facility will go on a total lockdown further inhibiting Mr. Redzepagic's constitutional rights. At MDC Brooklyn, immediately after an inmate tested positive for the coronavirus on March 21, 2020, the facility went on lockdown indefinitely: No inmates are allowed into or out of the building for any reason, including court appearances. Certainly, we can expect this will be the case when a COVID-19 case is confirmed at the MCC. That event will mark the complete evisceration of Mr. Redzepagic's right to counsel.

As the public health crisis rapidly evolves, so too does the judiciary's perspective on release. On March 18, 2020, Chief Judge McMahon granted an application for bail based on compelling reasons related to the current health crisis. Defense counsel had argued that "[a]

9

complete cessation of visits at this critical time of preparation would make it impossible to adequately prepare for trial…." *United States v. Hudson*, 19-CR-496 (CM) (Mar. 13, 2020). Five days earlier, she had denied the request. *Id.*

To mount an effective defense at trial, Mr. Redzepagic must be released from custody. This extraordinary moment requires judicial intervention to safeguard Mr. Redzepagic's constitutional rights.

## II.     The Bail Reform Act requires Mr. Redzepagic's temporary release.

When an individual is in custody, the Bail Reform Act "permit[s] the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). There is no greater necessity for the preparation of a "person's defense" than access to counsel. And there is no more "compelling reason" than a person's physical health.

Liberty is the norm and "detention prior to trial or without trials is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). One charged with a crime is, after all, presumed innocent. *Stack v. Boyle*, 342 U.S. 1, 4 (1951). A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system. *United States v. Montalvo-Murillo*, 495 U.S. 711, 723–24 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). Due to the crucial interests involved, it follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations

omitted), *cert. dismissed sub nom.*, *Melendez-Carrion v. United States*, 479 U.S. 978 (1986).

The courts have long recognized that there is no greater necessity than keeping a defendant alive, no matter the charge. As Judge Weinstein held, "We do not punish those who have not been proven guilty. When we do punish, we do not act cruelly. Continued incarceration of this terminally ill defendant threatens both of these fundamental characteristics of our democracy." *United States v. Scarpa*, 815 F.Supp.88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC").

This Court should consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Mr. Redzepagic will yield, relative to the heightened health risks posed to Mr. Redzepagic during this rapidly encroaching pandemic. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case").

Indeed, Judge Nathan recognized that "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason [to release the Defendant] under 18 U.S.C. § 3142(i)." *United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020) (releasing the defendant concluding that in light of changed circumstances, Mr. Stephens does not pose a danger to the community). *See also United States v. Perez*, 19-CR-297 (PAE) (Mar. 19, 2020) (concluding "compelling reasons exist for temporary release of the defendant from custody during the current public health crisis").

11

In *United States v. Rodriguez*, the Court held that with respect to an accused's need to consult with counsel, "Section 3142(i)(3) reaches above the minimum" standards set by the Sixth Amendment. 2014 WL 4094561, at *4 (W.D.N.Y. 2014) (Scott, M.J.). The subsection's plain text "mandates the removal of any impediment to 'private consultations' [between attorney and client] that are qualitatively and quantitatively 'reasonable.'" *Id*.; *cf. Falcon v. U.S. Bureau of Prisons*, 52 F.3d 137, 139 (7th Cir. 1995) ("Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, [the court] has the statutory authority to protect [defendant's] access to counsel.").

Even before the Covid-19 outbreak occurred, Mr. Redzepagic's ability to assist in trial preparation was limited by the fact that discovery in this case is voluminous and a protective order forbids the defendant from reviewing any of the materials designated "Highly Sensitive" outside the presence of his attorneys or their staff **(ECF #21)**. The "Highly Sensitive" materials includes thousands of pages of social media postings, the results of a forensic search of the defendant's cell phone and laptop computer and the defendant's videotaped statement which is approximately six hours long. Needless to say, it is logistically extremely difficult to be able to meaningfully review such a large quantity of important discovery with Mr. Redzepagic in a jail setting. It would be much more effective if Mr. Redzepagic were released and able to review the materials with counsel or counsel's staff at the attorney's office (or the defendant's home depending on the terms of his release conditions).

Since the Covid-19 outbreak, it has been impossible to meet with Mr. Redzepagic to review materials and discuss his case and it is unclear that the prohibition on attorney visits will be lifted soon or even before the pre-trial suppression hearing scheduled for May 19 and May 20, 2020.

12

At the very least, the Bail Reform Act demands that Mr. Redzepagic be released for the duration of the coronavirus outbreak and it is submitted that it also requires that he remain released pending his trial in this case.

**III.    Conditions of Release Are Available That Allow Elvis Redzepagic To Be Treated Humanely While Also Ameliorating Any Danger to The Community**

At a Bail hearing held before Magistrate Judge Anne Y. Shields on March 6, 2017, Mr. Redzepagic, through his prior attorneys, consented to a permanent order of detention with leave to return with a proposed bail package at a later date **(ECF #9)**.

It is respectfully submitted that Mr. Redzepagic does not present a danger to the community nor does he present a significant risk of flight. While the crime with which Mr. Redzepagic is charged, attempt to provide material support for terrorism (18.USC. 2239A(b)) is a very serious offense, the particular allegations against him are that he attempted to travel to a foreign country to join one or more organizations that have been designated by the Secretary of State as Foreign Terrorist Organizations. Mr. Redzepagic of course denies those allegations and intends to defend against them at a trial which had been expected to take place this summer. Importantly however, there is no allegation that Mr. Redzepagic has ever had any affiliation with a terrorist organization in the United States or that he has in any way been involved in terrorist, violent extremist or subversive activity in this country.

The court's duty to protect the public and ensure the defendant's return to court can be achieved very effectively by releasing him under conditions that he be confined to his parents' home in Suffolk County, New York and that he required to comply with electronic monitoring and whatever other conditions the court deems appropriate.

From Mr. Redzepagic's perspective, not just his liberty, but also his life, is on the line.

13

The danger presented by the Covid-19 virus to a prison environment creates a powerful incentive to abide by any release conditions the Court may impose and radically alters the calculation that initially led the parties to consent to a detention order in the first place.

A release under home confinement would also make it possible for Mr. Redzepagic to communicate with his attorneys and participate in preparing for trial. If his current detention is continued, such participation will be severely limited at best and impossible at worst.

## CONCLUSION

The substantial threat to Mr. Redzepagic's health from the Covid-19 virus and it's spread through the community and jail populations greatly outweighs any concerns of danger to the community or risk of flight connected with his release. Furthermore, Mr. Redzepagic's constitutional right to counsel will continue to be denied if he is kept in pre-trial detention. The interests of justice require that Mr. Redzepagic be released promptly under appropriate release conditions including electronic monitoring and home confinement.

Accordingly, I respectfully request that the Court issue an order releasing Elvis Redzepagic on bail. In the alternative, I respectfully request a bail hearing this week for Mr. Redzepagic.

March 24, 2020                                    Respectfully Submitted

                                    /s/ *David Roche,*    /s/ *Hassan Ahmad*
                                    David Roche          Hassan Ahmad
                                    Attorneys for Elvis Redzepagic
                                    20 Vesey St., Suite 1400
                                    New York, NY 10007
                                    (212) 430-6380

cc: Artie McConnell, Esq
    Saritha Komatireddy
    Assistant United States Attorneys
    Eastern District of New York

    Clerk of Court (ECF)

14