8:36 am, Mar 31, 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X Docket#
UNITED STATES OF AMERICA,      : 17-cr-00228-DRH-AKT-1
                               :
    - versus -                 : U.S. Courthouse
                               : Central Islip, New York
                               :
ELVIS REDZEPAGIC,              : March 30, 2020
              Defendant        : 11:15 AM
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL HEARING
BEFORE THE HONORABLE A. KATHLEEN TOMLINSON
UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**

**For the Government**:           **Richard P. Donoghue, Esq.**
                                  United States Attorney

                          BY:     **Artie McConnell, Esq.**
                                  Assistant U.S. Attorney
                                  100 Federal Plaza
                                  Central Islip, NY 11722

**For the Defendant**:            **David Roche, Esq.**
                                  **Hassan Ahmad, Esq.**
                                  Ahmad & Roche LLP
                                  22 Cortlandt Street
                                  16th Floor
                                  New York, NY 10007

**Transcription Service**:        **Transcriptions Plus II, Inc.**
                                  61 Beatrice Avenue
                                  West Islip, New York 11795
                                  laferrara44@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

THE CLERK:  Calling case number 17-cr-228, United States of America v. Elvis Redzepagic.

Please state your appearance for the record, (indiscernible).

MR. ROCHE:  Okay.  For the defendant, Elvis Redzepagic, this is David Roche, and my partner Hassan Ahmad is also on the line.

Good morning, your Honor.

THE COURT:  Good morning.

MR. MCCONNELL:  Artie McConnell for the United States.

Good morning.

THE COURT:  Good morning.

PRETRIAL SERVICES:  Amanda Sanchez of pretrial services.

Good morning, your Honor.

THE COURT:  Good morning.  All right.  Does that cover all the attorneys who are present?

MR. MCCONNELL:  Yes.

THE COURT:  Thank you.  I understand there are eleven participants on this call, and that we anticipated that there would be members of the press, who were attending and didn't dial in today.  I need to know how those individuals, please if you would, identify yourself, and what organization you are from for purposes

3

Proceedings

of today's hearing.

MR. KESSLER: Bob Kessler from Newsday.

THE COURT: Thank you.

MR. PACKMAN: Andrew --

THE COURT: (Indiscernible).

MR. PACKMAN: Andrew Packman (ph.) from the FBI is on the call.

THE COURT: Okay. And also (indiscernible).

MR. MARZULLI: John Marzulli, I'm the public information officer for the United States Attorney's Office.

Good morning, your Honor.

THE COURT: Good morning.

MR. ZELLER: Special Agent Mike Zeller (ph.) with the United States Attorney's Office.

Good morning.

THE COURT: Good morning.

MR. SARCONE: Sgt. Joseph Sarcone (ph.) from the JTTF FBI office in Long Island.

THE COURT: All right. Is there anyone else? All right.

I do want to state for the record that this hearing is being recorded today by the Court, and I am directing that no other recordings take place of this call. Certainly, if you need a transcript, and you can

4

Proceedings

get one, and that will be available to anyone who requests one, but there's no private recording by anybody who is attending on this line.

Now first of all, we're doing this today obviously by teleconference, and so I am going to ask those who will be speaking to do your best if you would please, to force yourself to slow down, and speak at a moderate pace.  I want to make sure that we have an accurate transcript, and I also want to be sure I can hear exactly what you're saying.

We all tend in these professions, to go faster when we're speaking but given the phone transmission, I would just ask everybody to be cognizant of that fact.

As we get started with the hearing today, I want to enter into the record the March 27th, 2020 letter from defendant's counsel, David Roche and Hassan Ahmad, and that letter states as follows:

"Dear Judge Tomlinson:  In response to your scheduling order from yesterday, please accept this letter as confirmation that we are waiving the appearance of our client, Elvis Redzepagic, at the bail hearing scheduled to take place by telephone on Monday, March 30th, 2020 at 11 a.m.  Respectfully, David Roche, and Hassan Ahmad."

And I'm marking that as Court Exhibit 1 for

Proceedings

5

purposes of this hearing.

(Court's Exhibit 1 was marked for identification)

THE COURT:  Now pursuant to statute, you're well aware of the fact that the purpose of the detention hearing is to determine whether any condition, or combination of conditions of release would reasonably assure the appearance of a person as required, and also the safety of the community.

I would note for the record that there have been two previous bail hearings in this case.  The first occurred on March 6th, 2017 before Magistrate Judge Shields, when both sides consented to the entry of a permanent order of detention.

The second bail hearing was conducted before me on June 5th of 2017.  At that time, defendant's counsel presented a bail package which was opposed by the government.  After paper submissions, and hearing argument from both sides, I made specific findings on the record, and concluded that the government had carried its burden, first of all, to show by a preponderance of the evidence that defendant Redzepagic was a flight risk, and second, to show by clear and convincing evidence, that defendant Redzepagic was a danger to the community.  And on that basis, I denied bail.

I have before me, defendant's motion to be

6

Proceedings

released from custody, as well as the government's opposition to the current motion.  I ask you to please keep in mind that I've carefully reviewed all of the papers that have been filed in connection with this motion.  I've also looked at the cases that have been referenced in the papers.  However, I am giving counsel for both sides the opportunity to address the application further if counsel wishes to do so at this point, and I would ask both sides to focus on the issue of what has changed since the last bail hearing.

Mr. Roche, this is your motion.  Do you wish to be heard?

MR. ROCHE:  Yes, please, your Honor.  Thank you.

So obviously, like you know, the first major change in circumstances, the COVID-19 outbreak which is, you know, dominating all our lives right now.  It's an extremely contagious, fast-spreading, and deadline disease.  It's turning out to be a lot more deadly than people had realized up until recently.

I'm looking at a chart showing the mortality rates from Italy and Spain, and of the -- just the confirmed cases in Italy, the death rate is 11 percent, and so you know, there's very credible information out there, that there's a lot of people dying who -- without

7

Proceedings

having been tested.  So this is of the people that have been tested and confirmed to have the virus over 11 percent are dying, and in Spain, it's about 9 percent, and those are the two countries that, you know, like they're a couple of weeks ahead of the U.S., and these are the most credible, I think, death rate numbers that we have because some of the numbers that were coming out of China -- you know, once they're being put under scrutiny, it seems that they're not very reliable, and that the death rate from China was likely much higher than what was stated.

So this is a very, very significant public health issue.  Obviously, the jails are not set up to deal with something like this.  It's unprecedented. There's never been anything like this, at least in any of our lifetimes.

So we know that from the City's jails, Rikers Island, they're releasing thousands of inmates because they realize that they can't contain it, and they can't adequately protect the prison population.

I would submit that the federal jails are no different.  It hasn't hit them as quickly, but we're still very much in the early stages of this spread of this disease in New York.  It's beginning to hit hard, but it's going to hit a lot harder.

8

Proceedings

So I would submit that just the public or the safety of the inmates should be taking very much into consideration, and I would submit that it is a major change in circumstance in evaluating what proper bail conditions are -- you know, whether it's appropriate to continue detention, or to release on bail.

I would submit that there are other change in circumstances, too. I think with the -- like the fact of this outbreak changes the flight risk calculation, too, in that obviously like there's a very pressing concern for any inmate trying to get out, that they not be put back in. So if a bail condition is put on a person or conditions of release, there's a very, very strong incentive to abide by those because if they fail to abide by them, they're being put back into a life or death, very dangerous situation.

I would submit that there are conditions of release that would adequately secure, you know, Mr. Redzepagic's return to court, if he was ordered to home confinement with electronic monitoring. I would submit that that would be more than adequate in ensuring that he comes back. He could be required to surrender a passport. There's no flight out of New York anyway, and there's really no evidence -- you know, we're a long ways into this case now, and there really is no evidence that

Proceedings

Mr. Redzepagic has any connections, or resources, that would enable him to be able to flee, especially under the circumstances where his passport is surrendered, and he's under electronic monitoring.

So I would submit that there's not really any significant risk of flight, if he was under, you know, pretty stringent release conditions.

I also would argue that he's not a danger to the community, and I think there's significant new information now that bears directly on that. Obviously, you know, at the outset of the case, these are, you know, serious charges. It's been submitted that Mr. Redzepagic on two occasions, a year apart, tried to enter Syria to join a terrorist organization, and a lot of the -- the kind of the -- I would submit, was the most compelling evidence against him was that there was a videotaped confession where he admitted to traveling through Turkey, and to the Syrian border.

So it seems like it could be a pretty strong case at the outset for the government. I would submit that now, two years later after discovery has been substantially completed, there's much more complicated -- a much more complicated picture has emerged.

It is very apparent from, you know, all of the materials, the government got access to our client's

10

Proceedings

computer, and cell phone, and they were able to download a lot of communications and evidence from that. I don't think there's any dispute that Mr. Redzepagic has a long-term drug addiction problem, addicted to many different drugs, and his life was basically a mess, dominated by his drug addiction.

In 2015, the Spring of 2015, his family sent him to Montenegro, basically to help him clean up. They tried other things before. He had gone into inpatient drug treatment on a number of occasions, and would work for awhile, and then he would relapse. So this was an attempt, send him to Montenegro where his father's family comes from. So he had relatives there. He had uncles. He had cousins, and they felt that this would get him out of the drug scene that he was in in New York.

After a few months, it became apparent that that wasn't working. He had found access to drugs over there, and was just as much of a mess, if not more than he had been in New York. So they made arrangements for him to come back.

His mother booked a flight for him at I believe connecting through Istanbul to Amsterdam, with the plan that he was going to come back from Amsterdam to New York. He missed -- he totally missed that flight. He didn't get on the flight in Montenegro. His mom had to

11

Proceedings

book him another flight, I believe either the next day or the day after, and this was a connecting flight through Istanbul to new York.

So he made the flight, the initial flight, to Istanbul, but missed the connection to New York, which was only about an hour layover between the two.  So he missed the connecting flight.  He was in Istanbul for a few days.  He missed another flight that his family -- that his mother had arranged for him to get back to New York, and during this time, there was a lot of bizarre communications where he was paranoid, he wasn't making sense, and so much so that his mother contacted the U.S. Embassy in Istanbul, asking for help, for -- and she characterized it as a medical emergency, that her son was delusional, and was mentally ill, and was wondering around Istanbul at a danger to himself.

So anyway, after I believe like five or six days, he -- and staying in a couple of different hotels in Istanbul, eventually he was -- he got a flight.  His mother got him another flight.  He actually got on that flight, and he came back to New York.

Now it's -- he subsequently, after he got arrested, like a year-and-a-half later, he confessed to having traveled to the Syrian border for the purposes of crossing the border into Syria.  It turns out that from

12

Proceedings

the evidence that we've seen, that is not true.  He didn't -- all the evidence shows that he never left the Istanbul area.  As I said already, the government got access to his computer, and his cell phone, and the location data all show that it's all confined to Istanbul.

So this story of him -- and by the way, the way that he said he got from Istanbul to the Syrian border was way of free taxis, and that was not really challenged -- that wasn't challenged at all in his videotaped interview as to how that would make any sense.  It's doubt -- approximately about a 10-hour, 10, 11-hour drive from Istanbul, to Adana, which is the city near the Syrian border that he said he'd gone to, and the thought that somebody could get free taxis for that length of journey just -- you know, it's just inconceivable.  But anyway, there's no evidence that he ever left Istanbul.

So the government's case is a lot different than it was -- than it seemed to have been earlier on in this prosecution, and because their theory was that he had traveled to the Syrian border.  He made an actual significant effort and got close to entering Syria.  It turns out that that's not true.

So I anticipate that they're probably going to claim that by missing the flight, that that constitutes

13

Proceedings

material -- attempt to provide material support for terrorism, but that's a very different case from being able to show that an individually actually, you know, traveled to the border to try and cross over.

So then, like -- so after he comes back to New York, it could be sent -- and you know, goes back to his old ways in New York, which he's still using drugs, trying to clean up a little. He's going to get, you know -- he's involved in religion. He's trying to learn Arabic, and then in -- about a year later, he goes to Jordan. I believe there might've been a trip to Saudi Arabia in between on a pilgrimage, but about a year later, he goes to Jordan, and his explanation, which has been consistent on, is that he went there to learn Arabic, and that he has considered going to Saudi Arabia, but chose Jordan, and he went over there to try and enroll in a language school.

When in Jordan, he -- after a couple of days in Jordan, he -- in Amman, he never left Amman, and after a couple of days he'd gone -- he was detained by Jordanian, to procure service agent. They came to his hotel. Like I said, he never left Amman, so they just -- he was in the same hotel. They detained him. They question him, and ultimately, deported him back to the United States.

Upon arriving back in the United States, he was

14

Proceedings

interviewed by Homeland Security, and actually when he came back from Turkey, he was interviewed by Homeland Security, as well. They were asking him what he had been doing there. He answered questions. They found him cooperative, and they released him.

The same thing happened after he came from Jordan. He was interviewed extensively, and was released without any follow-up investigations, and he basically just left and went home.

And with regard to the Jordan charges, we've received absolutely no discovery about Jordan, you know, apart from the reports that were prepared by Homeland Security on the interview when he came back, we got -- received no reports of any investigation that the Jordanian authorities did. We were provided nothing to show that the government's theory that he traveled to Jordan to go from there into Syria, is anymore likely or credible than Mr. Redzepagic's claim, which all along has been that he was going there to learn a language.

So I don't understand how the government's going to prove as the Jordan charges, or even try to prove the Jordan charges. It seems to me that there's theory that by just going to Jordan, and the fact that Jordan has a border with Syria, that that's enough to prove that he attempted to enter Syria to join the

15

Proceedings

terrorist organization.

So the point of all of this would be that this is really not this -- the case that it seemed to be in the beginning. I would submit it's not a strong case. We're getting ready for trial. I believe that the defense, we have -- I believe a viable defense in this case.

And I don't think that our client has a significant motive to flee in this, that he does have a defensible case at trial.

So there's also -- all the discovery that has been provided, there's nothing to show that Mr. Redzepagic has ever involved himself with any subversive organizations, or activity in the United States or in New York. The only allegation is that he tried to get to another country to join a -- you know, an organization over there.

So there's nothing that we've learned in the two years of this case, that would cause one to believe that Mr. Redzepagic presents a threat to his New York community where he lives. So I would just ask that that be taken into account, as a change of circumstance, because we have a much clearer and deeper understanding of what the evidence is at this point than we did have at prior hearings in this matter.

16

Proceedings

So I think from the evidence that has been exchanged, the picture that's presented is a drug-addicted, delusional young man, who was having mental health episodes, undiagnosed mental health episodes. There's a lot of documentation of him hearing voices, and he talks about being visited by the Jinn, which are supernatural beings in the Muslim faith, and the dream-like figures that speak to people.

So he repeatedly talks about the Jinn speaking to him, and hearing voices. And he says that he's been hearing voices for about two years.

Even on his videotaped statements, first of all, he told the agents that he was still high from the drugs, and that he hadn't slept in I think two days or something, and he talks about his heart hurting. He had talked about hearing voices, and this is all presented in more detail in our suppression motion, which Judge Hurley has reviewed and is currently pending. We currently have a hearing scheduled for May.

But the -- Judge Hurley, after reading the motions, and viewing the videotape of the statement presumably, requested that a competency hearing be conducted of Mr. Redzepagic, and obviously indicating some conference as to Mr. Redzepagic's mental health, and to his ability to be able to understand the proceedings,

Transcriptions Plus II, Inc.

17

Proceedings

and we haven't obtained the results of that yet.

But I guess what the -- what I am trying to present is that there are significant change of circumstances, and there's significant change in understanding of the evidence, and the available proofs in this case going forward, and we have a deeper understanding as to who Mr. Redzepagic is, what his history is, and what his issues have been.

I believe that the evidence that has -- that we have obtained, shows that he is not a flight risk, that he's not a risk to the community, and for those reasons, I would ask that, or I would submit that the risk to his health, the very, very significant risk to his health from this Coronavirus outbreak outweighs, and considerations -- or the considerations that exist regarding his, you know, risk of flight are a detriment to the community.  I don't believe that they really are -- there is a significant risk of flight, or a significant threat to the community, and there is a very, very real threat to his health.

And also, just because -- I know that the Bureau of Prisons is taking measures to try and protect the inmates, but it has the knockdown effect of denying access to counsel, and I'm not -- you know, I'm not saying what they're doing -- that they're wrong in the

18

Proceedings

procedures, but just the practical effect of it is that attorneys aren't able to visit, and it's going to be really difficult to prepare for hearings and trials in this matter, under the evolving circumstances.  It's kind of hard to envision within the next couple of months as things changing enough that attorneys are going to be able to go in and spend significant time, preparing trials in the federal jails.

So just for all of these reasons, your Honor, I would ask that we release conditions and allow him to go to his parent's house, and that he be placed on, you know, electronic monitoring, and whatever conditions that pretrial services recommends to ensure that he stays there, and that he complies with the directives of the Court.  So I think that completes my submission.  Thank you.

THE COURT:  All right.  Thank you, Mr. Roche.

Let me turn then to Mr. McConnell.  Do you wish to be heard, Mr. McConnell?  Mr. McConnell?

MR. MCCONNELL:  Oh, hello?  I'm sorry.

THE COURT:  Yes.

MR. MCCONNELL:  Can you hear me?

THE COURT:  Do you wish to be heard?

MR. MCCONNELL:  Yes, your Honor.  I apologize.

First, nothing that I am going to argue here

19

Proceedings

should be taken as minimizing the risk or seriousness of the epidemic.  This is not the only bail application that my office has received or that the Courts will be adjudicating.  We have to look at each one individually, and certainly there are some difficult determinations that need to be made.

Mr. Redzepagic's case, however, is not one of them.  Your Honor has to focus on things that had changed.  Let me start by mentioning something that have not changed.  He is still a danger to the community.  He is still a flight risk.  I disagree completely with defense counsel's assessment of the case.  If anything, this case has simply gotten stronger as we've had the opportunity to investigate further, and there is no health or other exigent reason why he should be released at this time.

Again, this is a presumption case where the presumption, just based on the nature of the charge alone, is one of detention.  The nature of the offense shows the defendant's dangerousness, and the proof is overwhelming.  Defense counsel conveniently leaves out that the defendant's cousin was a commander in ISIS that was actively on the battlefield in Syria.  The proof that he made two attempts to go there to join him on the battlefield and wage Jihad again is overwhelming.  He

20

Proceedings

made statements on numerous occasions to law enforcement. These were incredibly detailed statements.  They were not the result of some fantasy or delusion.

And his statements were also made to third-parties, to friends, to other people, both before, during, and after these crimes were committed.  We are not simply relying on the defendant's statements in proving his case.  His movements, and his activities are thoroughly corroborated through travel records, through airline bookings, through financial documents, and through examination of his social media, and his laptop which again, I would encourage the Court to look at ECF docket number 97 where the government gives the most recent recitation of some of the materials that were found on the defendant's laptop which show that he made extensive attempts to negotiate a ticket, a one-way ticket to Turkey in 2015.  There is geolocation information showing his laptop usage throughout the Greater Istanbul area.  Some of those geolocation -- some of that geolocation data is up to 20 miles outside of the city center.  He was looking at Montenegrin language websites sponsored by ISIS that were designed to help foreign fighters from the Balkans, join them in Syria.

And most notably, there are communication records between the defendant and his family members

Transcriptions Plus II, Inc.

21

Proceedings

where they're frankly, clearly aware of what he was going to do, tried to talk him out of it, instructed him on how to delete things from his computer, so is covered when he gets back, and is questioned by anyone at Customs.

You know, that's just some of the evidence that's been uncovered since the last time we appeared before your Honor. Again, the idea that this is a weak case, I couldn't disagree more, but really that's what trials are for. We're not here today to conduct a trial of the facts in this format. There will be a trial in this case, and I'm very confident that the government will be able to sustain its burden, and convict the defendant on all charges.

The defendant's dangerousness, I'm not going to repeat what I put in my letter, but I do want to point out that his behavior and his adherence to this extremely violent brand of ideology has not abated at all since he's been in jail. He has been recorded on numerous conversations making statements that show that his mind set has not changed. Most recently, he spoke about any non-Muslim as being an enemy. So this is not someone who has mellowed since he's been incarcerated on this case.

Similarly, your Honor, the risk of flight hasn't changed at all. He could very easily get on a plane and go to Montenegro or any other third country.

Proceedings

22

He has a support system overseas in a variety of locations. As I said, he has a cousin who was an ISIS commander, who was actively on the battlefield, and the idea that now that he's been incarcerated for this period of time with a pending case, and faces a guidelines sentencing of somewhere in the neighborhood of 30 years, I think is not something that would make him likely to stick around for the trial.

One thing I want to highlight about his dangerousness is what the defendant was doing the last time he was at liberty, and I'm putting aside the conduct that he's charged with, and anything related to it.

In February of 2017, when the defendant was living at home with his family, the same family that the -- that counsel now says are qualified suretors, where he should stay now, his family called 911 twice in February of '17, to remove the defendant from their home due to his repeated violent behavior. And in March of 2017, shortly before his arrest, he was again removed from his home, because he was trying to cut his tattoos off with a knife, and threatening to kill and behead his mother.

When he was arrested on the instant charges, he told one of the federal agents that he felt like stabbing him. So this is not someone's whose dangerousness is limited to the charges contained in the indictment. He

23

Proceedings

has proven again and again that he is prone to violence, and really impulsive criminal conduct that cannot be neutralized by pretrial supervision, or really any condition that this Court might impose.

I want to address, and I do have to point out the irony in the defense claiming that the defendant is some sort of a drug-addicted, delusional, and mentally ill person, while at the same time saying that he poses no risk if he is at liberty. I don't believe that the defendant is some irrational, delusional person, who didn't know what he was doing, or doesn't know what he was doing. He is a violent person. That is not the same thing as being a mentally ill person, but nevertheless, I think counsel undercuts their own argument by citing that as a reason for his release or questioning the strength of the case on that basis.

You know, with respect to the current health issues that the defendant has and the current situation in MCC, at the time we filed our letter, MCC had no confirmed cases, that was late last week. Now they have three confirmed cases. And I think we would all expect that number to increase.

That being said, the Bureau of Prisons is implementing measures that are outlined in the government's letter, where they're doing the best they

24

Proceedings

can to contain the virus.  I will note that the defendant is not housed on the COVID-19 quarantine floor.  He is on the ninth floor.  He is allowed to self-quarantine further by remaining in his cell, should he choose to do so.

And while, you know, MCC would not disclose the defendant's medical -- any medical information, the defense has retracted its original assertion that he had active tuberculosis, which of course would require the defendant, you know, be removed to a negative pressure room, or hospitalized.

So again, I am not minimizing the situation at the MCC, but the defendant's certainly not differently situated than anyone else in the facility, and again, not being a doctor, of course, I would argue that there are certain things about the defendant, such as his age, that make him presumably in a better position to handle the epidemic than other inmates at the facility.

As far as the defendant's Sixth Amendment rights, this is something that again, that all inmates are dealing with.  Counsel visits are being evaluated on a case-by-case basis, by BOP, and they are willing to do it, but it has to be a compelling reason.  It's unclear to me that counsel has tried to get a visit with Mr. Redzepagic, but be that as it may, I've been informed

25

Proceedings

that beginning next week, BOP is going to be rolling out a video teleconferencing capability for MCC which should alleviate some of the burden here.

But a few case specific factors I want to point out on the Sixth Amendment issue. First of all, as counsel conceded, discovery in this case has largely been completed some time ago. So there's been plenty of time to review all of the materials with the defendant and I would assume that they had done so prior to filing the suppression motion, which was lengthy, and touches on the majority of the evidence in the case.

I will also say that from the government's perspective, we have been extremely open with our evidence. This is not a case where we are keeping secrets or hiding our strategy, as a trial tactic. As I said, this case is just overwhelming. We have brought the defendant's attorneys, and actually the defendant himself, into our office to do a reverse proffer to some of the evidence that has been obtained, so everyone understands the proof, and what a trial would likely look like here. So we have been very open in our discussions with the other side with respect to the evidence.

And I know it wasn't raised by defense counsel, but there are some materials that are subject to protective order in this case. I would say that

26

Proceedings

communication between myself and defense counsel has been open, and very good. We've always been willing to modify the protective order, to the extent that we feel is reasonable, and the protective order itself gives the Court the ability to arbitrate any disputes between the parties, and we remain willing to revisit designation of certain materials on a case-by-case basis.

So I don't think that there's anything that would require -- where the defendant's Fifth Amendment rights are being violated. Again, we have no pressing hearing date. We don't have a trial date that has been scheduled. I think there's going to be ample time for the defendant, and his counsel to prepare for both hearings and trial, hopefully soon, once this crisis has been averted.

I also want to highlight some of the case law that's been generated from similar bail applications, citing the pandemic. To my knowledge, all of the district judges within the Eastern District of New York have addressed this question of bail based on COVID-19, and all of them have thus far concluded that the circumstances do not justify release, and I think the vast majority of magistrate judges have, as well, both for pre-trial, and post-conviction prisoners.

I reference the Campbell and Hamilton decisions

27

Proceedings

in my letter. I won't go into those. I think that the cases cited by the defense, United States v. Stevens (ph.), and United States v. Rehan (ph.), are easily distinguishable from the instant case. Again, in Stevens, there was a diminished strength of the government's case, and there was a looming hearing date, neither of which is the case here. In Rehan, Judge Orenstein's decision involved the revocation of supervised release in a drug case based on a failed drug test, and that is certainly not analogous to Mr. Redzepagic, who is a violent, aspiring jihadist, who is awaiting trial for two felony terrorism charges.

One additional case that I came across since filing the letter is United States v. Amato, it's 19-cr-442. It's Judge Glasser's case where two defendants who were aged 61 and 54, I believe, and charged with racketeering offenses, including extortion, and loans harking, they cited health and pulmonary issues, as well as an inability to prepare their defense, and both of those defendants had their bail applications denied.

So the case law that's been generated in a short amount of time clearly shows that these applications are disfavored. The compelling reasons have to be just that, compelling, and it -- you've seen both district and magistrate judges, deny applications in

28

Proceedings

circumstances where the risk of flight, and the risk of dangerousness is much, much less acute than it presents with Mr. Redzepagic.

One other thing that I will say on the Sixth Amendment issue is that the district has recently created a mechanism for handling counsel visits in this new environment, specifically the appointment of former Attorney General Loretta Lynch, to come up with some protocol to ensure that the Bureau of Prisons is taking all reasonable steps to preserve inmates Sixth Amendment rights, while obviously maintaining the ability to manage facilities, including the MCC in a safe way.

And I think that that process needs to play out, especially in a case like Mr. Redzepagic's where we don't have any exigency.  There's no looming hearing or trial date.  The discovery has been in their possession for quite some time, and it's really hard to see a Sixth Amendment issue with the defendant that's any different than every other pre-trial inmate.

So again, I think that circumstances that we find ourselves in are new, they're undoubtedly serious.  These applications have to be looked at on an individual basis.  But this, from the government's perspective, is simply not a tough decision.  The defendant is a -- he's dangerous.  He's a risk of flight.  He is not similarly

29

Proceedings

situated -- differently situated than any other inmate with respect to COVID-19.  The Bureau of Prisons is doing everything it can to maintain the safety of the facility, and the defendant's Sixth Amendment rights while certainly hampered by not being able to meet with counsel, freely as they did before, there's no exigencies here where that is going to be anything more than a temporary issue.

So I am going to ask your Honor to continue the order of detention because frankly, it's the only way to keep the community safe from the defendant, it's the only way to keep the defendant safe from himself frankly, and it's the only way to ensure that he will appear in court to face these charges when we're finally ready to get back to business.  Thank you.

THE COURT:  All right.

Mr. Roche, would you like a short rebuttal?

MR. ROCHE:  Yes, I would, your Honor.  Thank you.

So just briefly with regard to the health reasons, you know, I did provide a letter of clarification regarding my client's tuberculosis condition.  He did have active tuberculosis as a child, and was hospitalized for a month, and was treated for over a year.  So that could have -- that puts him at

30

Proceedings

greater risk for the Coronavirus, if he was to be exposed and to contract Coronavirus, it's the -- the CDC has recognized that people with underlying lung conditions are at risk, and obviously somebody who had active tuberculosis as a child could potentially have, or is likely -- or likely has lung damage, and lung weakness because of that, that would make them particularly susceptible to this new virus.

I would like to address a little bit about Mr. McConnell's reference to my client's cousin who is a commander in ISIS. I think there's some question as to whether this person is a cousin or not, or is a cousin or a distant cousin, but something that is more relevant is that even though the government got warrants, and they did a full search of my client's computer, his cell phone, his social media account, they found no communication between Mr. -- our client and this purported cousin, who is a commander.

So once again, it's just the -- as the discovery comes forward, their claims, it's easy to say you know, he has a cousin, and he is trying to reach this cousin, but there's no evidence that's been presented that that was actually the case. And yes, so that's kind of my main point for that.

I think, you know, the -- it's also easy to say

31

Proceedings

that he has a particular ideology. It's another thing to be actually able to prove that. This young, confused man who may have looked some things up on the internet, but that doesn't mean that he has a violent ideology, and in fact, we haven't seen any evidence presented by the government that he actually does adhere to any violent ideology, or he has any violent intentions.

The -- with regard to the behavior in February and march of 2017, leading up to his arrest, the domestic dispute that his family called the police, I would submit that this is entirely consistent with Mr. Redzepagic being a drug addict. This is not -- this is common type of behavior for families that have a drug-addicted child, or young adults in the household, and it's not uncommon for people with drug-addicted family members to call the police when the person gets out of control.

The circumstances now are that he has been in jail without any access to drugs for two years. I can tell you that just in my interactions with him, he has become a lot more lucid, a lot more easier to communicate with, over the last year or two, and seems to be a lot more stable.

It would be helpful in ensuring that he maintains that stability. It could easily be ordered that he has to check in with a drug counselor, or do some

32

Proceedings

kind of remote drug counseling, to make sure that he's staying on track with that, and he could be drug tested to make sure that he is not using illegal drugs again.

So I don't think that what Mr. McConnell stated indicated that he is a violent person, as much as it indicates that he was a person with a very serious drug addiction, which was impacting his behavior when he was living with his family two years ago.

With regard to the Sixth Amendment issues, (indiscernible) we've had the discovery for some time, or you know, we've been getting it gradually over the last couple of years, and we have discussed the discovery with our client, but we're at the point now where the case is gearing up for hearings and trial, and there is a significant suppression hearing that's scheduled for mid-May in this case, and the videotaped statement alone, my client's videotaped statement is like six hours long. There's thousands of pages of like social media printouts, there's a lot of discovery to go over with our client in preparation for hearings on trial, which is that -- and that kind of -- it now is the time for -- that works needs to be done.

You know, discussions that we've had prior to now, are you know -- they don't have to be as detailed, or as -- you know, in as much minute detail because it's

33

Proceedings

not with a view to actually preparing for a hearing at trial.

So you know, I do think that that's -- it's a logistical problem. It is going under the kind of conditions that exists now, and the conditions that are foreseeable going forward, it's going to be very difficult for counsel to communicate with client in a meaningful way, especially in cases such as this one, with voluminous discovery, and a protective order. So it's not like we can just give him the material, and then allow him to review them by himself. We have to be actually present with him to review it. So it does create very real, logistical issues.

With regard to the case law, there are some cases that I have found since submitting my motion papers that -- where the magistrate judges in the Eastern District and Southern District have been finding that the health considerations related to COVID have warranted a change in bail conditions, and a release order. Specifically, the case of United States v. Eli, at 20-cr-50. This was a defendant who was charged with multiple robberies involving guns and drugs, but was released because of the COVID risk.

And in United States v. Placencia (ph.), that's 20-mj-205 for the defendant who was charged with

34

Proceedings

attempted armed robbery, was released because of COVID concerns.

Also, United States v. Barras (ph.), 19-cr-436, and it's also released for -- because of COVID concerns. And also United States v. Joanna D'Alba (ph.), 19-cr-563, where a defendant which medical vulnerabilities was -- even though they weren't very specific to the kind of listed medical vulnerabilities, she was released also because of concerns of COVID.

And those are all Eastern District cases, I believe. There's also a number of cases from the Southern District that have been hard in the last week or so. So we mentioned United States v. Stevens. Also United States v. Santiago, Ramos (ph.), 20-cr-04, and United States v. Baker (ph.), 20-cr-125, United States v. Lopez (ph.), 19-cr-323, United States v. Almaleh, A-L-M-A-L-E-H, 17-cr-26. I have United States v. Bizarry (ph.), 19-cr-767, and there are others, too. There's a lot of cases that are coming up in the last week or so where the courts have been releasing defendants because of this COVID concern.

And we know that this is a very serious pandemic that high mortality rates. We don't know where it's going to go yet, and I submit that based on all the information that we have, the risk to Mr. Redzepagic's

Transcriptions Plus II, Inc.

35

Proceedings

health is a lot more concrete, and a lot more compelling than any risk of flight. I don't believe there is a credible risk of flight, and I don't believe that he is -- he had been demonstrated to be a violent person, and I don't believe that he presents any risk to -- significant risk to the community.

So for those reasons, your Honor, I would ask that you release him on appropriate release conditions. Thank you.

THE COURT: All right. In the responding and issuing a decision here, I am going to start off from the current issue with respect to the COVID-19 circumstances, and then work my way over to the 3142 factors that have to be considered when bail is being requested.

So specifically, defendant's counsel has brought this motion under 18 USC Section 3142(I), and cites the Bail Reform Act which states that, and actually provides for quote/unquote --

MR. ROCHE: Your Honor, I'm sorry, I can't actually hear you.

THE COURT: I'm sorry. Let me see if I can get the phone a little closer. Hang on. All right. Is that any better?

MR. ROCHE: That's better, yes.

THE COURT: All right. First of all, I am

36

Proceedings

speaking to the fact that the motion here brought by defense counsel is brought under 18 USC Section 3142(I). Counsel cites the Bail Reform Act as providing for "temporary release" of persons in pre-trial custody, to the extent the judicial officer determines such release to be necessary for preparation of the person's defense, or for another compelling reason.

Defense counsel, here Mr. Roche, states that because of increasingly dangerous public health crisis, Mr. Redzepagic's physical health is being imperiled. I mean, to some extent I think we could probably say that of every inmate in both the MCC, MDC, and every federal prison across the country at this juncture.

However, I also agree with counsel that each case here as we're instructed to do, has to be decided on a case-by-case basis, taking the individual factors into account.

Now counsel has cited the ongoing denial of access for attorney visits at the MCC. The current protocol, which is a matter of public record at this point, and the protocol that's also being communicated to the judges of the Eastern and Southern District, does permit requests for visitation by counsel, even in these circumstances. I don't see anything in the record here that reflects any requests having been made and turned

37
Proceedings

down, for example.

With respect to the asserted TB status of Mr. Redzepagic, the indication in the letter here is this is something from childhood, is latent, but purportedly recently it was positive.  There was a correction in a follow-up letter that Mr. Roche submitted.

I also note that there's been no medical records of any kind submitted to the Court to report exactly what Mr. Redzepagic's condition is.

I do want to point out a couple of things. One, in looking back through this matter since the first arrest, and I am looking then, directing your attention right now to the pre-trial services report that was prepared in this case, in terms of being presented for the arraignment, on page 2 of that report where it discusses the physical health of the defendant, it states that "The defendant stated he is in moderate, good physical health, with only minor medical problems noted. He did not disclose having any specific medical prescription, or being prescribed any medication.  He did report that he had mental health issues, and noted that he previously had been prescribed Xanax, but noted that he had not been seen by a mental health professional."

Now as counsel stated this morning, and as reflected in his papers, he notes that "Because TB

38

Proceedings

impacts lungs, any existing damage from tuberculosis would make Mr. Redzepagic particularly vulnerable if he were to contract COVID-19."

I want to bring to your attention the fact that the MCC, and the MDC, were both asked and both compiled a list of the inmates who were determined to be potentially at risk for complications based on COVID-19. The Federal Defenders Service proffered that information, and received it, it is now a matter of public record, and I will tell you that based on the MCC list, Mr. Redzepagic's name does not appear there.

I appreciate, and I think everyone who is functioning in this environment appreciates, the statistics that have been made part of practically our daily experience about this virus from newspapers, from the internet, from physicians, from briefings from the Governor of the State, as well as the Mayor of the City of New York, it's not that we are unaware by any means.

I do want to just address briefly the cases that have been talked about in your papers, as well as mentioned here this morning, in which I do believe the circumstances in those cases are certainly distinguishable from Mr. Redzepagic's circumstances.

In Rehan, in the case that was cited United States v. Rehan, 20-68, which is a case of Judge Cogan's

39

Proceedings

but where Magistrate Judge Orenstein conducted the hearing, I think it's very important to note that the hearing was based on the defendant's violation of his conditions of release.  He essentially was charged with conspiracy and possession of methamphetamine.  He was an acknowledged drug user who kept testing positive in terms of the violations, and while they were apparently trying for a bed to get him released elsewhere for treatment, I think from the record here it's pretty clear that Judge Orenstein said to him he was going to release him, but if he continued to use -- release him for purposes of the virus, but not solely on that basis, to release him to get into a program and a bed, that if he continued to use, he would put him right back in the MDC.  And within a few days, Mr. Rehan had not only cut off his electronic monitoring device, he was using again, and he was then remanded.  I find those circumstances quite different from what we're talking about here.

And much the same as in the Stevens case, which is 15-95, that case involved a violation of supervised release.  So again, we're not talking about people who are in pre-trial status here.  And I fully expect there would be a difference of opinion amongst some of the judges because everyone is trying to sort through here, weighing out the potential impact of the virus, weighing

40

Proceedings

the individual defendant's medical circumstances, and weighing the factors involved in a bail assessment here, as to dangerousness, and risk of flight.

As far as the Sixth Amendment right to counsel, counsel is absolutely correct that on March 13th, the Bureau of Prisons issued a notice that all visits in all federal correctional facilities would be suspended for at least 30 days.

I would also bring to your attention, which is also up on the Court's website, Administrative Order 2020-06, in which Judge Mauskopf addressed this issue, and said the following:

"In order to protect public health, and in order to reduce the size of public gatherings, and reduce unnecessary travel, the United States District Court for the Eastern District of New York hereby issues the following order."

At that point, it said "The courthouses in Brooklyn and Central Islip would remain open for business, subject to specific limitations; that effective March 16th, all civil and criminal jury trials in the Eastern District of New York that were scheduled to begin before April 27th, are continued pending further order of the Court. The Court may issue other orders concerning future continuances as necessary and appropriate."

41

Proceedings

"Compliance" -- and continuing with this order, "Compliance with all trial-specific deadlines in civil and criminal cases scheduled to begin before April 27, 2020, is at the discretion of the assigned judge."

And I think as a practical matter at this point, counsel are probably likely aware that there are no trials going forward in either one of these courthouses.

In item 6 on this particular Administrative Order, Judge Mauskopf says, "The Court is cognizant of the right of criminal defendants to a speedy and public trial under the Sixth Amendment, and the particular application of that right in cases involving defendants who are detained pending trial. Any motion by a criminal defendant seeking an exception to this order in order to exercise that right should be directed to the district judge assigned to the matter in the first instance; provided, however, that no such exception may be ordered without consultation with the chief judge."

In paragraph 7 she goes onto say, "The time between March 16, 2020, and April 27, 2020, is hereby excluded under the Speedy Trial Act in all criminal matters, as the Court finds that the ends of justice is served by taking such action, and outweighs the interests of the parties and the public in a speedy trial, and in

Transcriptions Plus II, Inc.

42

Proceedings

the time in which an indictment must be filed."

At paragraph 9 she says, "Initial appearances and arraignments shall continue to take place in the ordinary course, or where practicable or necessary, be conducted remotely pursuant to procedures established by the Court. Detention and bail review proceedings shall be scheduled with the approval of the assigned district judge, or duty magistrate judge."

Now there have been several subsequent administrative orders that have made it clear, again that no trials have been conducted. Also made it clear that we can't be taking pleas outside the courthouse. And so there have been regular extensions, and I suspect there will be here, especially given the announcements of the last 24 hours from the federal government.

So specifically here, no trial date has been set in this case. There are still motions pending before Judge Hurley. I know there's been a reference here, and I see it in the docket, to a suppression hearing taking place at the end of May, which I suspect may well not go forward, given the circumstances.

Yes, speedy trial has been suspended at least through the April 27th date, and that's likely to be extended, and I have no doubt that the trial here is going to be adjourned to a later date.

Transcriptions Plus II, Inc.

43

Proceedings

And certainly given the circumstances, I fully expect that Judge Hurley will be taking into account the difficulties encountered by any criminal defendant and counsel trying to deal with preparation for a trial. I fully suspect that whatever time this is going to be needed, the parties will get. You know, unless you're in a position where you do really want to push to have the trial sooner, and that's certainly a decision left to counsel and the defendant.

I don't see that the current circumstances put Mr. Redzepagic at a disadvantage to the extent that it would require a release from custody at this point to prepare for trial.

Now just to go to the issues with respect to weighing the two factors I have to consider here, which is the question of dangerousness to the community, there are two counts pending here in the indictment.

Count 1 is attempt to provide material support to a foreign terrorist organization, which charges Mr. Redzepagic within the period of June 15th to August 15th, of attempting to provide material support and resources to one or more foreign terrorist organizations, here the Islamic State of Iraq and Al-Sham, meaning ISIS, and the Al-Nusra Front, all designated by the Secretary of State as foreign terrorist organizations.

Transcriptions Plus II, Inc.

44

Proceedings

Count 2 is attempt to provide material support to a foreign terrorist organization, and the charges are basically the same except for the time period having changed. Here it's September 2016 to October 2016.

In looking at the first factor I have to consider, which is the nature and circumstances of the offense charged here, and I am going to incorporate by reference, the points that were made by me in the June 2017 bail hearing because they were fairly detailed.

As to the nature and circumstances of the offense charged, this is a very serious set of charges here. The offense arises from the defendant's attempts to travel to the Middle East in 2015, and '16, in an effort to enter Syria and wage violent Jihad.

I know that defense counsel dispute the strength of that argument but that is something that will be played out at trial because the government certainly holds the opposite view.

This is a presumption case. The charged offenses here carry a statutory sentence of 20 years under 18 USC Section 2339(b)(A)(1), and I am further advised as I had been previously, that looking to the sentencing guidelines, he's actually looking at a potential 30-year sentence.

You know, the defendant's conduct here is not

45

Proceedings

just a matter of words but of actions.  He made multiple trips abroad in an effort to literally join a foreign terrorist organization with as he put it, the goal of committing Jihad, eventually as part of this group.

He made no effort to conceal any of this, even after he was arrested.  In fact, he made multiple admissions to law enforcement, and truly it's hard to imagine a more serious crime.

With respect to the weight of the evidence, I find that the weight against the defendant here is strong.  In addition to everything else, he's got numerous postings on social media expressing hatred towards the United States, an affinity towards violent Jihad, and his intent to join a terrorist organization.

He made many admissions to this effect to law enforcement, and also gave over his -- let them review his computer, lots of social media listings related to the underlying charges here, and also acknowledged that he purchased a firearm in Montenegro in 2015.

He attended a pro se -- excuse me, a pro-ISIS mosque in Montenegro, and then traveled to Turkey as a conduit to Syria, and as defense counsel says -- states, he didn't make it across the border into Syria; I think that's besides the point here.  He made more than one attempt to try to cross the border.

46

Proceedings

He's 26-years-old.  He voluntarily, as I said, gave law enforcement access to his Facebook account.  He admitted travel to the Middle East and attempted to join ISIS for the Al-Nusra Front.

He has ties to Montenegro.  He has family there, and there's apparently a family home there.  He has a history of substance abuse, as we are all aware of at this point, for which he was previously hospitalized. I'm not diminishing his mental health issues because I think he clearly does have mental health issues.

It does concern me, however, that that matter cuts both ways.  Counsel has suggested that this is a young, confused man.  That he doesn't really hold a violent ideology.  I don't think based on what I've seen, what the government has presented, that that's entirely accurate.

What I think is important, these mental health issues which have brought law enforcement to the family home in February 2017, demonstrate that this young man is not stable, at least appears not to be stable.  He, I know, has a history of drug addiction, and mental health issues, and counsel has talked about his hearing voices, and having hallucinations, and frankly, those things purportedly cause him to behave in the way he has, and given that behavior, I have great pause here, and reason

47

Proceedings

to be concerned.

I don't think that the defendant's carry the burden to overcome the presumption of dangerousness here as well as the plaintiff -- excuse me, the defendant being a flight risk.

What is very significant to me is the fact that since his arrest, this thought process, this behavior apparently has not abated, and it's continued to essentially state the views that he has held for any number of years here, especially referring, as indicated to non-Muslims as being the enemy.

And frankly as to a risk of flight, if he were released, notwithstanding the current circumstances, people find ways to travel.  They find ways to leave the country, and I am not confident that releasing him even with specific conditions would assuage that concern.

I find that the evidence against Mr. Redzepagic is substantial, and as I said, notwithstanding as serving an effective basis for allowing his release.  His own admissions are quite damning.

After considering the factors under 3142, and weighing those, I find that the government has carried its burden -- actually here, because of it's being asked, the burden has shifted to defense counsel, but I still see and find that this defendant is a danger to the

48

Proceedings

community, and that he is a risk of flight, and I believe that the government has maintained the level of proof necessary, both under the preponderance of the evidence standard for risk of flight, as well as the clear and convincing evidence of dangerousness to the community.

Is there anything further from the government?

MR. MCCONNELL:  No, your Honor.

THE COURT:  Mr. Roche, anything further on behalf of Mr. Redzepagic?

MR. ROCHE:  No, your Honor.  Thank you.

THE COURT:  All right.  We're concluded then. As I said, you can certainly get a copy of the transcript, if necessary.  You can speak to Mary Ryan, my courtroom deputy.  Thank you, all.

MR. ROCHE:  Thank you, your Honor.

MR. MCCONNELL:  Thank you.

(Matter Concluded)

-o0o-

Transcriptions Plus II, Inc.

49

                            **I   N   D   E   X**


                        **E   X   H   I   B   I   T   S**

<u>**Court's Exhibits Marked for Identification**</u>:

**Court's Exhibit 1** . . . . . . . . . . . . . . . . . . . . **5**

50

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and **accurate** transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **31st** day of **March**, 2020.

*Linda Ferrara*

Linda Ferrara

AAERT CET 656
Transcriptions Plus II, Inc.