

|  |  |
|---|---|
|  | **U.S. Department of Justice** |
|  |  |
|  | *United States Attorney*<br>*Eastern District of New York* |
| DMP:SK/JAM<br>F.# 2017R01195 | *271 Cadman Plaza East*<br>*Brooklyn, New York 11201* |

September 22, 2021

<u>By ECF and E-Mail</u>

The Honorable Denis R. Hurley
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

        Re:    United States v. Elvis Redzepagic
                   Docket No. 17-CR-228 (DRH)

Dear Judge Hurley:

        The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for October 6, 2021.  On April 23, 2021, the defendant Elvis Redzepagic pleaded guilty to attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1).  The defendant on two separate occasions attempted to enter the Syrian battlefield to fight jihad.  Under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), the defendant's Guidelines range is 240 months' imprisonment, and his conduct warrants a severe incarceratory sentence.

**Offense Conduct and Procedural History**[1]

        The Presentence Investigation Report ("PSR") accurately summarizes the offense conduct.  <u>See</u> PSR at ¶¶ 3-13.  As described in the PSR and herein, an investigation by agents from the Federal Bureau of Investigation ("FBI") and members of the Joint Terrorism Task Force ("JTTF") revealed that the defendant made two separate attempts to

---

        [1]    This proffer of facts—most of which are summarized in the PSR—is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at any <u>Fatico</u> hearing on disputed issues.  Where the content of communications or documents are described, they are done so in pertinent part and in sum and substance, unless otherwise indicated by quotations.

enter Syria and wage jihad on behalf of designated foreign terrorist organizations, the Al-Nusrah Front ("ANF") and the Islamic State of Iraq and al-Sham ("ISIS").

Specifically, the government's investigation revealed overwhelming evidence of the defendant's intent to enter Syria and wage violent jihad, including: airline, financial, and border crossing records; records from the defendant's social media accounts that reflect his violent ideology and intent to join a terrorist organization; and evidence from the defendant's laptop computer evincing his criminal intent and attempt to cross the Syrian border from Turkey. In addition, the defendant has made numerous statements to both law enforcement and third parties regarding his attempts to enter Syria and join terrorist organizations.

I. Background on ISIS and ANF

A. ISIS[2]

ISIS is widely recognized as one of the preeminent terrorist threats in the world today, responsible for more deaths than any other terrorist or extremist group over the past several years. At the time of the defendant's offense conduct, ISIS was pursuing the objective of an Islamic state, or caliphate, based in the Middle East and had controlled swaths of territory in Iraq and Syria. ISIS routinely carried out killings and deliberate targeting of civilians; mass executions; persecution of individuals and communities on the basis of their religion, nationality, or ethnicity; kidnapping of civilians; forced displacement of Shia Muslim communities and minorities; killing and maiming of children; rape; and other forms of sexual violence. ISIS recruited thousands of foreign fighters from across the globe to assist with its efforts to expand its caliphate in Iraq and Syria. ISIS also leveraged technology to spread its violent extremist ideology and for the purposes of inciting adherents to commit terrorist acts. Tens of thousands of extremists and others have traveled to Syria and Iraq to join ISIS.

---

[2]  On or about October 15, 2004, the United States Secretary of State designated Jam'at al Tawhid wa'al-Jihad (popularly known as "al-Qaeda in Iraq" ("AQI")) as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act ("INA") and as a Specially Designated Global Terrorist ("SDGT") entity under Section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIS listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), al-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On or about September 21, 2015, the Secretary of State added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

While ISIS has been largely defeated in its home territory of Syria and Iraq, it remains capable of launching attacks in those countries, and has also inspired individuals and affiliated groups to stage attacks in other parts of the world, including the United States. The point does not need to be belabored: ISIS has killed countless people and seeks, without exaggeration, the destruction of the United States of America. See, e.g., United States v. Suarez, 893 F.3d 1330, 1332 (11th Cir. 2018) (ISIS follower had "declared allegiance [to ISIS and] attempted to recruit others to join him in destroying the United States"); Doe v. Mattis, 889 F.3d 745, 749 (D.C. Cir. 2018) (ISIS "controls territory in Iraq and Syria, and has perpetrated and aided terrorism there and around the world, killing several thousand civilians, including American aid workers and journalists"); United States v. Khusanov, 731 F. App'x 19 (2d Cir. 2018) (noting that ISIS has a "history of particularly violent conduct" and "target[s] members of the United States armed forces serving abroad and encourage[s] terrorist acts within this country") (citation omitted).

B. ANF[3]

ANF, presently known as Hay'at Tahrir al-Sham ("HTS"), is a Syrian-based jihadist group. Since November 2011, the group has claimed credit for numerous terrorist

---

[3] On or about December 12, 2012, the Secretary of State amended the designation of AQI to include the aliases al-Nusrah Front, Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant. Then, on May 15, 2014, the Secretary of State, in response to the evolving nature of the relationships between ANF and AQI, amended the FTO and SDGT designations of AQI to remove all aliases associated with ANF. Separately, the Secretary of State then designated al-Nusrah Front (ANF), also known as Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, Al-Nusrah Front for the People of the Levant, Al-Nusrah Front in Lebanon, Support Front for the People of the Levant, and Jabaht al-Nusra li-Ahl al-Sham min Mujahedi al-Sham fi Sahat al-Jihadb, as an FTO and SDGT. On October 19, 2016, the Secretary of State amended the FTO and SDGT designations of ANF to include the following new aliases: Jabhat Fath al Sham, also known as Jabhat Fath al-Sham, also known as Jabhat Fatah al-Sham, also known as Jabhat Fateh al-Sham, also known as Fatah al-Sham Front, also known as Fateh Al-Sham Front, also known as Conquest of the Levant Front, also known as The Front for liberation of al Sham, also known as Front for the Conquest of Syria/the Levant, also known as Front for the Liberation of the Levant, also known as Front for the Conquest of Syria. On May 17, 2018, the Secretary of State amended the FTO and SDGT designations of ANF to include the following aliases: Hay'at Tahrir al-Sham, also known as Hay'et Tahrir al-Sham, also known as Hayat Tahrir al-Sham, also known as HTS, also known as Assembly for the Liberation of Syria, also known as Assembly for Liberation of the Levant, also known as Liberation of al-Sham Commission, also known as Liberation of the Levant Organisation, also known as Tahrir al-Sham, also known as Tahrir al-Sham Hay'at. To date, ANF remains a designated FTO.

3

activities, including several suicide bombing attacks in Syria. At the time of the defendant's offense conduct, ANF sought the establishment of an Islamic state in Syria, had labeled the United States and Israel as "enemies of Islam," and operated as an official branch of the global terrorist organization al-Qaeda. Currently, the group still operates in Syria's northwest and remains at war with the government in Damascus.

II.     Defendant's Background

The defendant is a U.S. citizen who was born and raised in New York, most recently residing in Commack, New York, on Long Island. He is a high school graduate and has completed some undergraduate coursework at a local community college. He has a prior arrest from January 2012 for robbery in the second degree, which was resolved with a plea of guilty to petit larceny, a misdemeanor. The defendant attended drug rehabilitation programs at various times and has received some addiction counseling, but appears to have discontinued his drug use while in prison. According to a competency evaluation conducted in April 2020, the defendant does not have any mental disease or defect. A copy of the report is attached hereto as Exhibit A.

III.    Offense Conduct

In the early summer of 2015, the defendant travelled to Plav, Montenegro, where his extended family resides. While there, the defendant attended a radical mosque founded by his cousin—Co-conspirator 1—became a devout Muslim and began discussing with Co-Conspirator 1 the idea of travelling to Syria. Co-conspirator 1 and certain other members of the mosque promoted extremist views and, as of 2015, had already travelled from Montenegro to Syria to wage jihad on behalf of designated foreign terrorist groups, including ISIS and ANF. The defendant knew this and knew that Co-conspirator 1 was the commander of a battalion in Syria. Indeed, the defendant had previously seen graphic photographs of dead U.S. military personnel and caskets covered with American flags posted to Co-conspirator 1's Facebook page and knew Co-conspirator 1 to be a follower of Abu Bakr Al-Baghdadi, the (now-deceased) leader of ISIS.[4] The defendant sought to join Co-conspirator 1 so that he, too, could wage jihad in Syria. While in Plav, the defendant met with the individual who facilitated Co-conspirator 1's travel from Montenegro to Syria. The defendant also communicated with Co-conspirator 1 over the internet about travelling to Syria.

Co-conspirator 1 directed the defendant to travel to Istanbul, Turkey—a common point of entry into Syria for those joining ISIS and ANF—and instructed the

---

[4]     Numerous articles and photographs of Co-conspirator 1 in open-source international media reported that Co-conspirator 1 was fighting in Syria and referenced Facebook comments from Co-conspirator 1's Facebook pages, which promoted violent jihad. The articles also contained photographs of Co-conspirator 1 depicting him on the battlefield, wearing camouflage clothing, and carrying an assault rifle.

defendant to contact Co-conspirator 1 when the defendant arrived in Istanbul so that Co-conspirator 1 could send someone to facilitate the defendant's entrance into Syria. Following this direction, the defendant conducted internet searches for "one way tickets to Istanbul" and "flight ticket from podgorica"—the capital of Montenegro—"to turkey." The defendant ultimately asked his parents to book him a flight from Montenegro to Amsterdam with a layover in Istanbul—intentionally misleading his family into thinking that he intended to travel to Amsterdam when, in fact, he intended to deplane in Istanbul and travel overland into Syria.

The defendant's family booked the requested travel and, in July 2015, the defendant traveled from Montenegro to Istanbul, Turkey, and attempted to cross the border from Turkey into Syria. He had a cellular telephone and a laptop computer with him. The defendant used his laptop computer to: search for extremist and jihadist propaganda, including lectures from Anwar al-Awlaki,[5] and numerous nasheeds, or Islamist hymns, that are often featured in propaganda videos by ISIS and other terrorist groups, including the "ISIS Anthem" in English; obtain maps of Syria, Jordan, and Turkey; access the website "Put hilafeta," or "Way to the Caliphate," a Bosnian-language website for prospective foreign fighters from the Balkans who seek to wage jihad in Syria; communicate over Skype with a U.S. based-associate, who warned the defendant that he was becoming too radicalized; and communicate over encrypted communications platforms including Telegram and Viber. In these communications, the defendant identified himself by the kunya, or nom de guerre, "Abu Bakr Ibn Abduallah Al Amriki."

While in Turkey, the defendant was unable to contact Co-conspirator 1, but he was able to reach an associate in the United States ("Co-conspirator 2," another individual who planned to wage jihad in Syria), who told the defendant to do "whatever [he] can" to get to Syria. The defendant remained in Istanbul for several days and stayed in hotels, a park, and on the street. He then left the city to travel towards the Syrian border, ultimately arriving in the southern Turkish city of Adana. There, the defendant made several unsuccessful

---

[5]    Anwar Al-Awlaki was a dual citizen of the United States and Yemen, and an Islamic lecturer and a leader of Al-Qaeda in the Arabian Peninsula ("AQAP"), a Yemen-based FTO. Al-Awlaki gained notoriety from his many English-language lectures that promoted violent jihad and encouraged followers to fight in the name of Islam. For example, on June 2, 2015, the defendant accessed a YouTube video of an al-Awlaki lecture, titled "Allah is Preparing Us for Victory," approximately five times. In this 1 hour 22 minute audio sermon, al-Awlaki preaches about the "epic battle that will occur between the Muslim nation" and the West, argues that "the long arm of American injustice will get you wherever you are…that battle will be the battle that will establish the Islamic Khilafah on a global scale," and urges his followers to join the battle and fight for Islam: "You really don't want to be sitting on the sidelines and lose out on all of this ajr [credit for good deeds] in this Golden Era; because it is a Golden Era…this is a Golden Era of Jihad."

.

5

attempts to obtain help and cross the border into Syria. However, unable to contact Co-conspirator 1 and frustrated by the lack of assistance he was receiving, the defendant left Turkey and returned to the United States.

Upon his arrival in the United States, the defendant was questioned by U.S. Customs and Border Protection officers and lied to them about the nature of his travel. He claimed that he inadvertently missed his connecting flight in Istanbul. After returning home, the defendant wiped his laptop computer.

Once back in the United States, although he had been unsuccessful in crossing into Syria to wage jihad, the defendant continued to think about returning to the region and entering Syria. He communicated with others about his desire to do so, and his Facebook communications during this time period laid his intentions bare:

- On or about October 13, 2015, the defendant sent a message to another individual, stating: "I read alot about jihad"; "And shariah law"; "Its self explanatory you fight for the sake of God."

- On or about October 13, 2015, the defendant sent a message to another individual, stating: "since i got back from turkey from trying to perform Jihad and join Jabhat Al Nusra the cia has been bothering me"; "Its annoying but i out smarted them." When asked if the "fighting" was "hypothetical," the defendant responded, "no it's a people fighting the oppressors the president of Syria bashar."

- On or about October 14, 2015, the defendant sent a message to another individual, stating: "Support the [martyrs] that are [shedding] blood for the sake of Allah every drop gets [their sins forgiven]. Also [their] musk smells of blood if you read some things i can show you that tells about the Mujahideen in El Sham [Syria] and how [they're] taking over"

- On or about October 14, 2015, the defendant sent a message to another individual, stating: "i just dont like this country"; "Listen once the Qur'an is no more and your time is up itll be to late this life is alony worldy adornments the Hereafter is better"; "there come a time where people will only know to say Allahu Akbar"; "Jihad is the best for u sister trust me u have to believe in the eternal those that die for the sake of Allah get to be green birds under Allahs Arsh throne."

- On or about October 17, 2015, the defendant sent a Facebook message to another individual, stating: "I'm trying to go over there"; "Or Syria InnShaaAllah."

6

- On or about December 29, 2015, the defendant sent another Facebook user a link to one of Co-conspirator 1's accounts and stated, "hes my cousin…lives in Aleppo Syria wit his wife n my other cousin."

In August 2016, the defendant travelled a second time in an effort to wage jihad in Syria. This time, the defendant travelled from New York to Amman, Jordan—a city even closer to Syria than Istanbul—in another attempt to cross the border into Syria. The defendant went to Jordan ostensibly to enroll in an Arabic language program, but while there he contemplated trying to enter Syria. Indeed, he had not enrolled in any language program and did not have any plan for housing upon his arrival. Jordanian officials approached him, queried him as to his true intentions and why he was attempting to travel to Syria, and ultimately deported him back to the United States. Upon his arrival in the United States, the defendant was found in possession of extremist propaganda and literature—including the titles "Commanders of the Muslim Army," "Jihad in the Quran & Sunnah," and "The Religious and Moral Doctrine of Jihad."

In February 2017, the defendant engaged in domestic violence against his mother. The defendant was "possibly high on drugs" and "throwing items around the house," according to a police report about the incident. He was also in possession of a small amount of marijuana. After being arrested, the defendant was verbally combative and spontaneously stated that he was going to "leave this country and come back with an army—Islam is coming."

In subsequent interviews with agents of the FBI New York Joint Terrorism Task Force ("JTTF"), the defendant confessed that he had twice sought to travel to Syria—once through Turkey and once through Jordan—in an effort to wage jihad in Syria. The defendant stated that while in Turkey, he was "placing his trust in Allah" and was "making a pilgrimage [hijrah] for jihad" that could result in his death. The defendant stated that "every step he took" in Turkey was for "jihad," and that the investigators were Muslims and "just didn't realize it yet." He stated that he was not taking or under the influence of narcotics while in Turkey.

With respect to his 2016 travel to Jordan, the defendant stated that he sought to attend an Arabic language school, but while there he contemplated trying to enter Syria, claiming he wanted to "help the children." The defendant explained that jihad could take many forms beyond simply warfare or violence. Though he openly expressed admiration for al-Awlaki, when asked if he intended to travel to Syria and join ISIS while in Jordan, the defendant replied that, if he were to admit to such conduct, he would "go to jail."

The defendant also stated that while he was not a violent person and did not want to kill innocent people, he was prepared to "strap a bomb" on himself. When asked by the JTTF agents who the defendant considered "innocent," he stated that he was not sure but believed ISIS was on the "right side."

7

On March 3, 2017, at approximately 10:30 a.m., JTTF agents arrested the defendant in his home pursuant to an arrest warrant issued by the Honorable Steven I. Locke, United States Magistrate Judge for the Eastern District of New York. The defendant refused to exit the bathroom of his home and became belligerent, telling one of the JTTF agents, "I feel like stabbing you right now."

Following his arrest, agents took the defendant to a JTTF facility, where he waived his Miranda rights and was again interviewed by agents. During the interview, the defendant reiterated much of the information relayed in his prior statements, though he was vague about the details of his travels in Turkey and Jordan and consistently sought to minimize his intent to wage violent jihad.

The defendant was arraigned on the criminal complaint the following day. Prior to being transported to the courthouse, the defendant told JTTF agents that he had called his mother after his arrest and planned on using his narcotics use and mental health as an excuse for his criminal conduct. A permanent order of detention was entered at his arraignment and the defendant has remained incarcerated for the duration of the case.

In communications with third parties while in custody, the defendant has continued to express extremist, anti-Semitic and anti-American sentiments. For example, the defendant frequently refers to non-Muslims as "kuffar," or infidels, and in an email sent on June 20, 2017, the defendant told a third party "you cannot have a christian or jewish friends these are our eniemies that want to see us denying the truth and make us fail dont ever forget that, treat them how they are, like enimies and you will be ok." Similarly, in a March 10, 2020 call, stated "we are enemies [Muslims and non-Muslims], that's it…We are in their country, if you say the truth that's is it…you are an enemy…See what Allah is doing to them. Forest fires. Kill millions of animals…They have new disease, new problems with the weather. Agriculture. Allah is punishing them [Americans and infidels]…This is not our country."

IV.     The Guilty Plea Proceeding

On April 23, 2021, the defendant pled guilty before the Honorable A. Kathleen Tomlinson, United States Magistrate Judge for the Eastern District of New York, to Count One of the above-captioned indictment, which charges the defendant with attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). The defendant executed a written plea agreement with the government and made a complete factual and legal allocution. On May 5, 2021, the defendant's plea was accepted by the Court. See ECF No. 137.

## Guidelines Calculation

The government submits that the Court should apply the Guidelines calculation set forth below, to which the defendant stipulated in the plea agreement and which is identical to the Guidelines calculation set forth in the PSR:

| | | |
|---|---|---:|
| | Base Offense Level (U.S.S.G. § 2M5.3(a)) | 26 |
| Plus: | Provision of Material Support or Resources with the Intent, Knowledge or Reason to Believe They Were to Be Used To Commit or Assist in the Commission of a Violent Act (U.S.S.G. § 2M5.3(b)(1)(E)) | +2 |
| Plus: | Terrorism Enhancement (U.S.S.G. § 3A1.4(a)) | +12 |
| Less: | Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a)-(b)) | -3 |
| Total: | | 37 |

This level carries a range of imprisonment of 360 months to life, as application of the terrorism enhancement places the defendant in Criminal History Category VI. However, because of the statutory maximum sentence, the effective Guidelines range is 240 months.

## Sentencing Law

The standards governing sentencing are well-established. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

However, that the Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence. In Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. Id. at 596-97. The Gall Court further instructed that, in the event that the sentencing court decides to impose a variance, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. (noting that a "major departure should be supported by a more significant justification than a minor one"). When "rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the case." United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009). Ultimately, the court "must state in open court the particular reasons supporting its chosen sentence." Carter, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)).

## Argument

In this case, a severe sentence is warranted because of, among other things, (1) the seriousness of the defendant's conduct, (2) the defendant's disregard for the law,

9

(3) the need for specific and general deterrence, and (4) the need to avoid unwarranted disparities in sentencing. See 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C), (a)(6).

I.        The Defendant's Conduct Demands a Severe Sentence

It is difficult to overstate the severity of the defendant's conduct. He gravitated towards and embraced the violent ideologies of terrorist groups that have murdered United States citizens overseas and that have promoted, and taken credit for, lethal attacks against civilians on U.S. soil and throughout the world.  Fully aware of this, the defendant attempted to provide a resource—personnel in the form of himself—necessary for these groups to continue their operations.

Indeed, the defendant's conduct implicates the core rationale underlying the material support statute.  See United States v. Farhane, 634 F.3d 127, 148 (2d Cir. 2011) (Section 2339B "criminalizes a range of conduct that may not be harmful in itself but that may assist, even indirectly, organizations committed to pursuing acts of devastating harm"). As the Supreme Court has stated, "[t]he material-support statute is, on its face, a preventive measure—it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." Holder v. Humanitarian Law Project, 561 U.S. 1, 35 (2010).

Attempting to provide oneself to a terrorist organization is one of the most dangerous forms of material support.  See United States v. Amri, No. 17-CR-50, 2017 WL 3262254, at *15 (E.D. Va. July 31, 2017) ("[c]ertainly attempting to provide oneself to a designated terrorist organization is at least, if not more, dangerous to human life than merely providing money"); United States v. Taleb-Jedi, 566 F.Supp.2d 157, 167-69 (E.D.N.Y. 2008) ("the provision of personnel, like the provision of money, acts to free up others in a terrorist organization to engage in violence and other acts of terrorism").  This is so not just because the provision of oneself to an FTO frees up the group's resources, but because those who "knowingly [seek] to join a terrorist group . . . risk . . . being turned against the United States." United States v. Tounisi, 900 F.3d 982, 986-88 (7th Cir. 2018) (stating that the defendant had "align[ed] himself with a group that advocates for the destruction of the United States and . . . placed himself at risk of becoming 'a pawn' in a future attack against the country"); see also United States v. Khan, 938 F.3d 713, 718-19 (5th Cir. 2019) ("[T]here is also evidence that [defendant] encouraged Garcia to join ISIS and provided funds for him to accomplish that mission, regardless of whether Garcia would be fighting in Iraq or Syria. Garcia did in fact travel to Iraq and joined ISIS. In any event, ISIS is an enemy of the United States.").  The defendant's actions directly implicate these concerns.

The defendant's conduct represents a unique and violent brand of criminality that simultaneously shows no respect for human life or the rule of law.  He twice attempted to enter an active warzone and wage violent jihad on behalf of a terrorist organization. Under such circumstances, a severe sentence is entirely appropriate.

II.       The Need for Specific and General Deterrence Is High

A lengthy sentence is necessary to deter the defendant, and others like him, from committing future crimes.

A.       General Deterrence

The defendant's desire to join a terrorist organization in Syria involved considerable and deliberate planning and execution. As with all crimes involving the degree of premeditation evinced by the defendant, a heavy sentence is necessary to deter others that might consider similar conduct. See United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("crimes [that] are more rational, cool, and calculated than sudden crimes of passion or opportunity…are prime candidates for general deterrence" (internal quotation omitted)).

Yet the deterrence factor is even more acute in terrorism cases. As multiple courts of appeals have recognized, in the terrorism context, the difficulty of deterrence necessitates the imposition of lengthy sentences. See United States v. Saleh, 946 F.3d 97, 112-13 (2d Cir. 2019) ("[t]errorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal." (quoting United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003)); United States v. Ali, 799 F.3d 1008 (8th Cir. 2015). Here, a substantial sentence in this case would send an appropriate and much-needed message to all persons harboring any (incorrect) notion that serving, joining, or aiding jihadist groups in any manner is meaningful and worth the risk.

B.       Specific Deterrence

Beyond merely fashioning an appropriate general deterrent, the Court's sentence must address the defendant's continuing danger to the community. As demonstrated by the violent and graphic content on his electronic devices, his internet history, and his social media messages, the defendant was fully aware of the brutal conduct and goals of both ISIS and ANF and is fully radicalized towards violent jihad. He sought to trade his life in Suffolk County, New York for the violent, hate-filled life created by these groups. More recently, as described above, in communications with third parties while incarcerated, the defendant continues to espouse highly inflammatory sentiments. His mental health history only exacerbates these concerns. In short, the defendant is a dangerous and unpredictable individual who must be incapacitated to protect the public.

Although courts have recognized that recidivism ordinarily decreases with age, courts have rejected this reasoning in terrorism cases. Echoing multiple courts of appeals, the Ninth Circuit instructed in United States v. Ressam: "[t]errorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." 679 F.3d at 1091 (quoting United States v. Jayyousi, 657 F.3d 1085, 1117 (11th Cir. 2011)). There is no particularized information here that overcomes the reasoning expressed by these courts of appeals.

III.   A Heavy Jail Sentence Avoids Unwarranted Sentencing Disparity

Numerous courts have recognized the need to impose the maximum allowable period of custody for convictions under Section 2339B, involving the provision—and often only the attempted provision—of personnel to ISIS and other terrorist organizations:

- Mohamed Naji, 16 Cr. 653 (E.D.N.Y.): Naji, a 40-year-old resident of Brooklyn, traveled to Yemen to join ISIS. Naji pled guilty to one count of attempting to provide material support to ISIS and was sentenced to the statutory maximum of 20 years.

- Zakaryia Abdin, 17 Cr. 283 (D.S.C.): Abdin, a 20-year-old U.S. citizen, was arrested after travelling to Charleston airport after having purchased a ticket to Jordan, from which he would then travel to Egypt and join ISIS. Abdin pledged his allegiance to ISIS and expressed his desire to travel overseas to fight on its behalf. Abdin pled guilty to one count of attempting to provide material support to ISIS and was sentenced to the statutory maximum of 20 years.

- Tairod Pugh, 15 Cr. 116 (E.D.N.Y.): Pugh, a 47-year-old U.S. citizen from New Jersey and U.S. Air Force mechanic, travelled from Egypt to Turkey in an effort to cross the border into Syria and join ISIS. Pugh was denied entry by Turkish officials, returned to Egypt, and thereafter deported back to the United States. Soon after arriving back at JFK, Pugh was charged with attempting to provide material support to ISIS. Pugh was convicted and sentenced to the statutory maximum of 15 years on the Section 2339B charge.[6]

- Abdella Tounisi, 13 Cr. 328 (N.D. Ill.): Tounisi made plans to travel to Syria to join ANF. Tounisi visited a purported recruitment website for ANF and emailed the listed contact person, who was actually an FBI agent. Tounisi was arrested at O'Hare International Airport attempting to board a flight to Turkey. Tounisi pled guilty to one count of attempting to provide material support to a terrorist organization and was sentenced to the then-statutory maximum of 15 years. The Seventh Circuit recently affirmed his sentence.

- Abdurasul Hasanovich Juraboev and Akhror Saidakhmetov, 15 Cr. 95 (E.D.N.Y.): Juraboev and Saidakhmetov were roommates who sought to travel to ISIS-controlled territories. Juraboev and Saidakhmetov

---

[6]   On June 2, 2015, the Senate passed the USA Freedom Act, increasing the penalty for violations of Section 2339B from 15 to 20 years.

were eventually apprehended— Juraboev after purchasing a ticket for a flight to Turkey and Saidakhmetov after attempting to board a flight to Turkey. Both defendants pled guilty to one count of conspiracy to provide material support to ISIS and were each sentenced to the then-statutory maximum of 15 years.

- Alla Saadeh, 15 Cr. 0558 (D.N.J.): Saadeh assisted his brother in attempting to join ISIS by paying for his ticket to Jordan. Saadeh also wished to join ISIS himself. Saadeh pled guilty to one count of attempting to provide material support to ISIS and was sentenced to the then-statutory maximum of 15 years.

- Adam Dandach, 14 Cr. 00109 (C.D. Cal.): Dandach made plans to travel to ISIS-controlled territory, purchased a ticket to fly from Orange County to Turkey, and was arrested at the John Wayne International Airport. Dandach pled guilty to one count of attempting to provide material support to ISIS and passport fraud and was sentenced to the then-statutory maximum of 15 years on the Section 2339B charge.

- Nicholas Young, 818 F. App'x 185 (4th Cir. 2020): Young recruited others to fight for ISIS and advised them on how to travel abroad without being flagged by authorities. Young was convicted at trial and was sentenced to the then-statutory maximum of 15 years on the 2339B charge.

More recently in this district, on March 13, 2020, Judge Seybert imposed a 13-year sentence for providing material support to ISIS in United States v. Shahnaz, 17 Cr. 690 (E.D.N.Y.). Shahnaz defrauded numerous financial institutions and laundered over $150,000 in stolen proceeds and cryptocurrency to ISIS. She then attempted to travel to Syria and join the group herself. Shahnaz plead guilty to one count of providing material support to ISIS.

Considering this precedent, a substantial sentence is appropriate to avoid unwarranted sentencing disparities with other defendants who engaged in similar or less serious conduct.

IV. The Defendant's Background Does Not Provide Significant Mitigation Away from a Severe Sentence

The circumstances of the defendant's upbringing and medical history provide some mitigation, but are not sufficient to justify a sentence substantially below the Guidelines. PSR at ¶¶ 42-79. See United States v. Vera Ramos, 296 Fed. Appx. 201, 203 (2d Cir. 2008) (affirming guideline sentence despite defendant's "difficult upbringing" and noting district court's observation that such circumstances are "almost universal" among defendants). By all accounts, the defendant enjoyed a positive childhood and was raised in a

13

"loving and supportive home environment." PSR ¶ 49. While the government does not dispute the defendant's substance abuse history and addiction, the defendant's refusal to seek and follow prescribed treatment has frequently been volitional. More broadly, given the defendant's predilection for citing and exaggerating his mental condition and substance abuse for his own benefit, the Court must take care before crediting such self-serving claims as significant mitigation.

Notably, the Second Circuit has recently acknowledged the severity of terrorism and material support cases by vacating below-Guidelines sentences that it found to be substantively unreasonable and cautioning district courts against placing too great reliance on mitigating factors that were inadequate to justify substantial departures from the applicable Guidelines ranges. See United States v. Mumuni, 946 F.3d 97, 108 (2d Cir. 2019) (vacating as substantively unreasonable a 17-year sentence, which was "shockingly low and unsupportable as a matter of law" as a downward departure from a Guidelines range of 85 years for, inter alia, conspiracy to provide material support to terrorists).[7] In Mumuni, as in this case, the defendant become radicalized and then conspired to provide material support to a foreign terrorist organization, without final consummation of his efforts. Id. In downwardly departing from the Guidelines range of 85 years, the district court in Mumuni relied on the defendant's youth at the time of the offense, his lack of a criminal record, and his lack of disciplinary infractions during his period of incarceration before sentencing. Id. at 111–12. The Second Circuit noted "the uncontroversial proposition that a District Court's major departure from the Guidelines should be supported by a more significant justification than a minor one," id. at 112 (internal quotation marks and brackets omitted), and held that these three factors could not bear the weight assigned to them. Id. In fact, the Second Circuit held that "no substantially mitigating weight can be borne here by the fact that [the defendant] did what was plainly required of him—that is, behaving himself in prison," id. (emphasis added), because such compliance is merely the minimum expectation, rewarded through good time credit, and moreover "has no bearing on the sentencing factors a district court must consider under 18 U.S.C. § 3553(a)." Id. Similarly, the court held that the defendant's "age and lack of prior criminal record cannot bear the mitigating weight [that the district court] assigned to them," id., and that the sentence of 17 years imposed in reliance on these factors "shock[ed] the conscience and cannot be located within a permissible range of decisions." Id. While the facts and conduct of Mumuni are admittedly more serious than those in the instant case, the court's language regarding mitigation in terrorism cases is instructive.

More recently, in United States v. Ceasar, --- F.4th---, No. 19-2881, 2021 WL 3640387 (2d Cir. Aug. 18, 2021), the Second Circuit found that a sentence of 48 months'

---

[7] In addition to pleading guilty to attempt and conspiracy to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, the defendant in Mumuni also pleaded guilty to conspiring to assault federal officers, in violation of 18 U.S.C. § 371; attempted murder of federal officers, in violation of 18 U.S.C. § 1114; and assault of a federal officer with a deadly or dangerous weapon, in violation of 18 U.S.C. § 111.

imprisonment, which reflected a downward departure from a Guidelines range of 360-600 months' imprisonment, was substantively unreasonable as a matter of law. In Ceasar, the defendant pled guilty to a violation of § 2339B for conspiring to join ISIS, then openly flouted the conditions of her presentence release by continuing to communicate with known supporters of ISIS and other extremist groups, attempted to conceal those communications from law enforcement authorities, and then lied to the FBI about her conduct. Id. at *3-4. The Second Circuit found that the district court abused its discretion and failed, as a matter of law, to give adequate consideration to the competing § 3553(a) factors and gave "overwhelming weight" to the defendant's need for rehabilitation from years of trauma and abuse. Id. at *17. The sentence of 48 months was insufficient to protect the public, deter criminal conduct of the defendant specifically and others generally, promote respect for the law, and reflect the seriousness of the offense committed, and the Circuit remanded the case for resentencing.

Certainly, the Court should consider the defendant's substance abuse history and psychiatric history as part of its analysis under 18 U.S.C. § 3553(a). See Exhibit A (April 15, 2020 competency evaluation.)[8]; U.S.S.G. § 5H1.3 ("[m]ental and emotional conditions may be relevant in determining whether a departure is warranted."). Indeed, the Second Circuit has acknowledged that such factors, as well as a defendant's age, lack of criminal record, lack of disciplinary infractions while incarcerated, and letters of support can provide mitigation in a terrorism case. See Mumuni, 946 F.3d at 111–12; Ceasar, 2021 WL 3640387, at *17 (defendant's "need for rehabilitation from years of trauma and abuse was one factor that the district court could have properly taken into consideration at sentencing"). The Second Circuit has simply warned not to assign such factors "overwhelming weight while failing to give adequate consideration to the competing goals of sentencing — including the need for the sentence to protect the public, deter criminal conduct of the defendant specifically and others generally, promote respect for the law, and reflect the seriousness of the offense committed." Ceasar, 2021 WL 3640387, at *17.

---

[8] The report noted that the defendant has a "remote history of symptoms of paranoia and a reported experience of auditory hallucinations, although it appears these symptoms were likely substance-induced and have since resolved." Exhibit A, p. 19.

## Conclusion

In this case, a severe prison sentence will appropriately capture the defendant's egregious conduct, account for the continuing danger he and other aspiring terrorists present to the community, and avoid unwarranted sentencing disparities. The government respectfully submits that such a sentence would be sufficient, but not greater than necessary, to carry out the goals of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

JACQUELYN M. KASULIS
Acting United States Attorney

By:   /s/
Saritha Komatireddy
Artie McConnell
Assistant U.S. Attorneys
Eastern District of New York
718-254-7000


cc:   Hassan Ahmed, Esq. and David Roache, Esq. (by ECF and E-mail)
Gregory Giblin, United States Probation Officer (by E-mail)