

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SK/JAM
F.# 2017R01195

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 29, 2021

By ECF and E-Mail

The Honorable Denis R. Hurley
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

   Re: United States v. Elvis Redzepagic
     Docket No. 17-CR-228 (DRH)

Dear Judge Hurley:

  The government respectfully submits this letter in response to the defendant's objections to the Presentence Investigation Report ("PSR"). Except as consented to herein, the government respectfully requests that the defendant's proposed amendments to the PSR be denied.[1]

Responses to Defendant Objections

I. Response to Objection One

  Paragraph 1 of the PSR states that "the defendant…attempted to provide material support and resources…to the foreign terrorist organizations Islamic State of Iraq and al-Sham ("ISIS") and al-Nusrah Front ("ANF")." PSR at ¶ 1. This sentence is accurate and should remain unchanged.

---

[1] The facts described herein—most of which are summarized in the PSR—is not a complete statement of all facts and evidence of which the government is aware or that it may seek to introduce at any Fatico hearing on disputed issues. Where the content of communications or documents are described, they are done so in pertinent part and in sum and substance, unless otherwise indicated by quotations.

A preponderance of the evidence proves that the defendant sought to enter Syria and wage jihad alongside his cousin—Co-conspirator 1—who the defendant knew to be a battalion commander and affiliated with either ISIS or ANF.  As discussed in the government's sentencing memorandum, publicly available internet articles and photographs of Co-conspirator 1 showed that Co-conspirator 1 was fighting in Syria on behalf of ISIS, as did Co-conspirator 1's various Facebook pages, which promoted violent jihad; contained photographs of Co-conspirator 1 armed and on the battlefield; and clearly identified him as a member of ISIS.  Examples of these news articles mentioning Co-Conspirator 1 as an ISIS fighter and posts from Co-Conspirator 1's Facebook page are attached hereto as Exhibits 1 and 2, respectively.  Notably, a search of the defendant's laptop yielded a variety of ISIS-specific extremist propaganda, including ISIS nasheeds, or Islamist hymns, including the "ISIS Anthem" in English.  Indeed, the defendant repeatedly accessed the website "Put hilafeta," or "Way to the Caliphate," a Bosnian-language website for prospective foreign fighters from the Balkans who primarily sought to join ISIS and wage jihad in Syria.  As the defendant accessed these materials immediately prior to his 2015 attempt to enter Syria from Turkey, the Court may readily conclude that the defendant was prepared to join Co-Conspirator 1 and wage jihad with either ISIS or ANF.

The defendant admitted as much in his two interviews with law enforcement in February 2017, when he explicitly and repeatedly stated that, at the time of his attempted travel in 2015, he believed Co-Conspirator 1 was either a member of ISIS or ANF, and that he had seen Co-Conspirator 1's Facebook pages depicting him as such.  FD-302 reports documenting the defendant's statements on February 2, 2017 and February 3, 2017 are attached hereto as Exhibits 3 and 4, respectively.  See Exhibit 3, p. 4 (defendant stated that Co-Conspirator 1 "is with ISIS…[and] believed to be a commander for ISIS"); p. 6 (when the defendant "started out he believed ISIS was on the right side (good side)…he's currently not sure who is right and who is wrong") and Exhibit 4, p. 3 (defendant stated "he was aware that [Co-Conspirator 1] was an ISIS fighter" and "observed several 'graphic' photos on [Co-Conspirator 1's] Facebook," including an "image of…the caskets of dead United States soldiers with the American flag covering their caskets").  As such, this objection to paragraph 1 should be denied.

To the extent the defendant seeks some benefit by disassociating himself from ISIS in favor of the arguably lesser-known ANF, it should be noted that ANF employs the same violent terror tactics as ISIS, a fact that the defendant was certainly aware of given his internet research and the propaganda collection on his laptop.  According to the National Counterterrorism Center, ANF "is one of the most capable al-Qaeda-affiliated groups operating in Syria" and has mounted "hundreds of insurgent-style and suicide attacks."  "Counter Terrorism Guide: Al-Nusrah Front," National Counterterrorism Center, available at https://www.dni.gov/nctc/groups/al_nusrah_front.html.  Indeed, ISIS "played a significant role in founding [ANF]" and provided ANF with "personnel and resources, including money and weapons."  Id.  "Several Westerners have joined [ANF], including a few who have died in suicide operations," including an attack in May 2014, which represented "the first known suicide bombing by an American in Syria."  Id.

At the time of the defendant's offense conduct, ANF propaganda publicized its war in Syria as an extension of a broader global jihad led by al-Qaeda and Osama bin Laden. For example, in September 2014, ANF released a video on Twitter documenting its operations to "liberate" a Syrian city—the video began with clips from a speech by bin Laden. See "The Way," al-Manara al-Bayda Media Foundation, September 12, 2014, available at https://ia601509.us.archive.org/22/items/On_The_ Way/Madon.mp4. Indeed, less than a year after the offense conduct in this case, terrorism expert Dr. Bruce Hoffman called ANF "more capable than ISIS and a more dangerous long-term threat" in testimony before Congress. See Bruce Hoffman, "The Evolving Threat of Terrorism and Effective Counterterrorism Strategies," U.S. House of Representatives Committee on Armed Services, February 14, 2017, available at https://docs.house.gov/meetings/AS/AS00/ 20170214/105560/HHRG-115-AS00-Wstate-HoffmanP-20170214.pdf. James R. Clapper, the former Director of National Intelligence, called ANF "one of the most capable al-Qaeda branches" approximately six months after the defendant's 2015 attempt to enter Syria through Turkey. See "IC's Worldwide Threat Assessment Opening Statement," Remarks as Delivered by the Honorable James R. Clapper, Director of National Intelligence, to the Senate Armed Services Committee on February 9, 2016, available at https://www.dni.gov/ files/documents/2016-0209SASC_open_threat_hearing_transcript.pdf. Prior to the defendant's 2015 attempt to enter Syria, the press widely reported ANF's potential efforts to recruit members from Western countries to launch attacks in the West. See, e.g., Mark Mazzetti, Michael S. Schmidt, and Ben Hubbard, "U.S. Suspects More Direct Threats Beyond ISIS," The New York Times, September 21, 2014, available at http:// www.nytimes.com/2014/09/21/world/middleeast/ us-sees-other-more-direct-threats-beyond-isis-. html?partner=rss&emc=rss&smid=tw-nytimes; "Al-Qaeda's Quiet Plan to Outdo ISIS and hit U.S.," CBS News, September 18, 2014, available at http://www.cbsnews.com/news/ al-qaeda-khorasan-syria-bigger-threat-to-us-than-isis/; Siobhan Gorman and Julian E. Barnes, "U.S. Tracks Threat against West by al-Qaeda Affiliate in Syria," the Wall Street Journal, September 18, 2014, available at http://online.wsj. com/articles/u-s-tracks-threats-against-west-by-al-qaeda-affiliate-in-syria-1411083639.

The government consents to amending the last sentence of paragraph 1 by adding the italicized language, as follows: "Count 2 remains pending *and will be dismissed on the motion of the government at the conclusion of sentencing*."

II.     Response to Objection Two

The defendant objects to the inclusion of paragraph 4, which contains background information regarding ISIS and its designation as a foreign terrorist organization. For the reasons described above, this paragraph is appropriate and should remain unaltered.

III.    Response to Objection Three

The defendant's proposed amendments to paragraphs 6, 7, 8, 9 and 14 should be rejected, as they mischaracterize the record of the defendant's statements to law enforcement and insinuate some government impropriety. To complete the record and

3

include the language proposed by the defendant, the government requests that the following be added to the PSR as attachments: FD-302 reports documenting the defendant's statements on February 2, 2017 and February 3, 2017, Exhibits 3 and 4, respectively; the video recording of the defendant's March 3, 2017 post-arrest statement and attendant circumstances, Exhibit 5; and a draft transcript of the defendant's post-arrest statement, Exhibit 6.[2]

As reflected in the aforementioned exhibits, the defendant was competent and coherent during each of his interviews with agents from the Joint Terrorism Task Force ("JTTF"). Indeed, prior to speaking with the defendant on February 2, 2017, JTTF agents asked the defendant if he was under the influence of any illicit substances or medication. See Exhibit 3 at p. 3. The defendant replied numerous times that he was not, explaining that he had last used narcotics—specifically, cocaine and "Molly," or MDMA—several days earlier. Id. While the defendant claimed to be feeling the effects of withdrawal from "Molly" when he was arrested on March 3, 2017, he stated that had taken the drug the previous evening, approximately eight hours earlier. See Exhibit 5 at 10:59:31[3] and Exhibit 6 at pp. 8-9. As depicted in Exhibit 5, though the defendant appeared lucid and coordinated (he was able to speak comprehensibly and walk under his own power during the arrest and arrest processing, including being able to walk outside and smoke cigarettes on numerous occasions), agents waited approximately four hours for the defendant to adjust and acclimate and gave him food and soda in the interim. Agents repeatedly asked the defendant if he was under the care of a physician, wanted to see a doctor, or wanted to go to a hospital, and the defendant declined each time. See Exhibit 5 at 11:14:11, 11:55:15, 12:09:54, 1:23:21 and 1:35:01. After several hours, agents asked the defendant a series of routine pedigree questions and noted that he was oriented to his surroundings and coherent. Id. at 11:15:23-11:31:31. The agents did not attempt to administer Miranda warnings or substantively interview the defendant until approximately 1:24 p.m., and upon the defendant's assurances that he was in good health and alert. Id. at 1:21:48- 1:26:34.

Accordingly, the defendant's proposed changes to paragraphs 6, 7, 8, 9 and 14 of the PSR should be denied. The government's proposal to add Exhibits 3-6 to the PSR will complete the record regarding the defendant's statements and allow the defendant to make whatever argument he chooses in support of his sentencing position.

---

[2] All of these materials were produced to the defendant during Rule 16 discovery and attached as exhibits to the government's response to the defendant's omnibus motion.

[3] The timestamp on the video begins at 10:53 a.m. and ends at 6:02 p.m.

IV.     Response to Objection Four

The defendant objects to the sentence in paragraph 8 of the PSR, which states that the defendant travelled to the city of Adana, Turkey during his 2015 attempt to enter Syria. See PSR at ¶ 8. As this paragraph recounts what the defendant told JTTF agents in his interviews in February 2017, the government consents to amending this sentence to make clear that the defendant *stated* that he travelled to Adana, rather than as a factual declaration that he did so. See Exhibit 3, p. 5 (defendant stated that he "eventually travelled and made his way from Istanbul, Turkey to the border town of Adana"); and Exhibit 4, pp. 4-6 (recounting the defendant's statements that he took taxis to Adana from Istanbul, stopping at a masjid to eat, sleep and use wi-fi).

However, the government disagrees with the defendant's assertion that there is no evidence that he ever left Istanbul during the charged period in 2015. Indeed, data recovered from the defendant's laptop proves by a preponderance the exact opposite. Geolocation information recovered from the laptop showed usage throughout the greater Istanbul area over the course of several days in July 2015, including some locations over sixty miles from the city center and over fifty miles from the airport. Attached hereto as Exhibit 7 are geolocation maps reflecting approximate locations where the defendant's laptop connected to wi-fi while in Turkey. For example, the maps in Exhibit 7 reflect wi-fi logins near the city of Marmaraereglisi, approximately fifty miles west of the airport and over sixty miles from the city center. See Exhibit 7, p. 3, 5. Another shows a wi-fi login near the city of Sanayi, approximately twenty-seven miles southeast of the Istanbul city center and over forty-five miles southeast of the airport. See Id. at 1-2.

Additionally, in one recovered Skype message between the defendant and his mother, attached as Exhibit 8, the defendant stated that he missed a flight because he "took a cab and he took me really far and dropped me off." Perhaps most telling, recovered messages between the defendant and an unknown individual via an internet-based Turkish-English translator, attached as Exhibit 9, suggest the defendant was indeed lost far outside any urban area; the individual tried to help the defendant get to the airport and queried the defendant "where did you come from? Who brought you to that deserted forest?" Exhibit 9, p. 2.

Accordingly, the defendant's present contention that he never ventured outside of Istanbul is belied by the facts.

V.      Response to Objection Five

The defendant denies telling JTTF agents that he was "prepared to strap a bomb to himself and sacrifice himself for jihad" and objects to the inclusion of this sentence in paragraph 9 of the PSR. The defendant made this statement during his February 2, 2017 interview, see Exhibit 3, p. 5, and it should remain in the PSR.

VI.  Response to Objection Six

The defendant objects to paragraph 10 of the PSR, which outlines the defendant's 2016 attempt to enter Syria through Jordan and is alleged in Court 2 of the indictment. The defendant is correct that, pursuant to his plea agreement, he only pled guilty to Count 1 of the indictment and allocuted to his 2015 attempt to enter Syria. Nevertheless, his 2016 attempt is relevant conduct that the government can prove by a preponderance of the evidence. See U.S.S.G. § 1B1.3(a) (relevant conduct for sentencing purposes includes "all acts and omissions committed…by the defendant [and] all acts and omissions…that were part of the same course of conduct or common scheme or plan as the offense conviction."). It should therefore remain in the PSR as written and be considered by the Court during sentencing.

The evidence in support of this relevant conduct begins immediately upon the defendant's arrival in the United States after his failed 2015 attempt to enter Syria, when the defendant was questioned by U.S. Customs and Border Protection officers and lied to them about the nature of his travel. He claimed that he inadvertently missed his connecting flight in Istanbul. See Exhibit 13, p. 2. After returning home, the defendant wiped his laptop computer.

Once back in the United States, although he had been unsuccessful in crossing into Syria to wage jihad, the defendant continued to think about returning to the region and entering Syria. He communicated with others about his desire to do so; Facebook communications during this time period made his intentions clear and are summarized in the government's sentencing submission. See ECF Docket No. 140, pp. 6-7 ("I'm trying to go over there…or Syria InnShaAllah"). Additionally, the government has attached hereto Exhibit 10, which contains certain translated communications between the defendant and other individuals on Facebook.[4] In one Facebook conversation with an individual in Macedonia ("Individual 1"), the defendant had a cryptic exchange where he explained how his communications were monitored while he was in Turkey, stating, "I have nothing to hide, I just want to study, and what are they following me for." Exhibit 10, p. 20. Individual 1 responds, "[t]hey are worried that those who go might be on their way to Syria." Id. In another Facebook conversation with a "brother" from the Plav mosque ("Individual 2") in January 2016, the defendant stated that he was going to "study" in Jordan, noting that Jordan is "near Syria, between Israel and Saudi," and encouraged Individual 2, "[c]ome with me, so that we study Arabic." Id. at 46. When Individual 2 refused, the defendant asked "[d]id you talk with Omar?"—a reference to Co-conspirator 1—and inquired about the "other brothers in the mosque"—a reference to the radical mosque that Co-conspirator 1 founded in Plav. Individual 2 responded and warned the defendant, "[d]on't write all kinds of things here

---

[4] Exhibit 10 cross-references the page number where the original message is located in the PDF of the defendant's Facebook page. This PDF was obtained from Facebook in response to a search warrant and was produced to the defendant as part of the government's Rule 16 discovery.

brother." Id. at 48.  In one March 2016 exchange, the defendant told Individual 2 that he shaved his beard because "everyone is afraid" when the defendant has a long beard. Individual 2 responded, "who cares if they are afraid…they should be, ha ha." Id. at 72-3.

In August 2016, the defendant travelled a second time in an effort to wage jihad in Syria.  This time, the defendant travelled from New York to Amman, Jordan—a city even closer to Syria than Istanbul—in another attempt to cross the border into Syria.  The defendant went to Jordan ostensibly to enroll in an Arabic language program, but while there he contemplated trying to enter Syria.  Indeed, he had not enrolled in any language program and did not have any plan for housing upon his arrival.  Jordanian officials approached him, queried him as to his true intentions and why he was attempting to travel to Syria, and ultimately deported him back to the United States.

Upon his return, Customs and Border Protection ("CBP") officers interviewed the defendant.  The defendant denied attempting to enter Syria, but was found in possession of extremist propaganda and literature—including the titles "Commanders of the Muslim Army," "Jihad in the Quran & Sunnah," and "The Religious and Moral Doctrine of Jihad."  He was released at the conclusion of the interview.

In subsequent interviews with JTTF agents, the defendant acknowledged that he wanted to enter Syria through Jordan.  Specifically, the defendant stated that he sought to attend an Arabic language school, but while there he contemplated trying to enter Syria, claiming he wanted to "help the children."  Exhibit 4, p. 7.

Accordingly, the defendant's objection on these grounds is meritless.  The PSR should remain unchanged, and the Court may consider his 2016 conduct as relevant conduct during sentencing.  In addition, the government objects to the defendant's characterization of the border patrol agents' conclusions after speaking to the defendant; rather than including that characterization in the PSR, to complete the record, the government requests that the CBP reports of the defendant's 2015 and 2016 interviews, attached hereto as Exhibits 13 and 11, respectively, be added to the PSR.

VII.   Response to Objection Seven

The defendant denies telling JTTF agents that he planned to use his drug use as an excuse for his criminal conduct and objects to the final sentence to this effect in paragraph 14 of the PSR.  The defendant made this statement during arrest processing and it was documented in an FD-302 report, attached hereto as Exhibit 12.  The objection to this sentence should be denied.

Conclusion

The government opposes amending the PSR based on the defendant's objections. Except as requested herein, the PSR should remain unchanged.

Respectfully submitted,

JACQUELYN M. KASULIS
Acting United States Attorney

By:   /s/
Saritha Komatireddy
Artie McConnell
Assistant U.S. Attorneys
Eastern District of New York
718-254-7000

cc:   Hassan Ahmed, Esq. and David Roache, Esq. (by ECF and E-mail)
Gregory Giblin, United States Probation Officer (by E-mail)

8