UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
Plaintiff,

v.

ELVIS REDZEPAGIC,
Defendant.

CRIMINAL NO. 17-CR-228 (DRH)

SENTENCING MEMORANDUM[1]

By:  David Roche, Esq.
     20 Vesey Street
     Suite 1400
     New York, NY 10007
     Tel: (212) 349-0300
     Email: david@ahmadroche.com

     Hassan Ahmad, Esq.
     20 Vesey Street
     Suite 1400
     New York, NY 10007
     Tel: (212) 430-6380
     Email: hassan@ahmadroche.com

---

1. Because of sensitive health related information contained in this document, we respectfully request to file this under seal.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
Plaintiff,

v.

ELVIS REDZEPAGIC,
Defendant.

CRIMINAL NO. 17-CR-228 (DRH)

SENTENCING MEMORANDUM

HON. DENIS R. HURLEY
United States District Judge
Eastern District of New York

TO THE HONORABLE COURT:

INTRODUCTION

Over the past sixteen years, federal sentencing has shifted dramatically, providing greater opportunities for lawyers, judges, and probation officers to help justice-involved individuals reduce their risk of recidivism by formulating a correctional treatment plan and giving judges more options to consider shorter prison terms and community corrections rather than lengthy periods of incarceration. Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), federal judges must impose a sentence that complies with 18 U.S.C § 3553(a). Section 3553(a)(2) sets forth four purposes of sentencing: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective matter."

Elvis Redzepagic (hereinafter "Mr. Redzepagic" or "Elvis") is scheduled to appear before this Honorable Court for his Sentencing Hearing on October 6, 2021, at 1:00 p.m. Mr. Redzepagic respectfully submits this Sentencing Memorandum with related exhibits, including letters of support from friends and family (**attached as Exhibit A**), to provide the Court with pertinent sentencing related information pursuant to FED. R. CRIM. P. 32, and Title 18, United States Code § 3661, and to highlight Mr. Redzepagic's strengths (and weaknesses) in order to assist the Court in formulating a sentence that will further his likelihood of success when he

returns to community living. This information is provided in support of a non-Guidelines sentence with supervised release and enrollment in a mental illness and chemical abuse ("MICA") program.

I.     BACKGROUND INFORMATION AND PROCEDURAL HISTORY

On February 2, 2017, Mr. Redzepagic's mother called 911 and asked for police to respond to their home in Comack, NY, because her drug addicted son was high and throwing things around the house. Suffolk county police officers responded to the home and, upon arrival, they observed Mr. Redzepagic in his bedroom rolling a marijuana cigarette and they also observed a marijuana plant in the bedroom which he admitted was his. PSR¶ 41. Mr. Redzepagic was arrested and charged with unlawful possession of marijuana. PSR¶ 41. The police claim that, during the arrest processing for this minor offense, Mr. Redzepagic was verbally combative with them and made statements to the effect that he was going to leave the country and come back with an army and that "Islam is coming." Because of these alleged comments, the police contacted the Joint Terrorism Task Force (Hereinafter: JTTF) who then responded to the Suffolk County Police Department, 4th Precinct and interviewed Mr. Redzepagic. Prior to commencing their interview, the only information the JTTF had regarding Mr. Redzepagic was that he was deported back to the United States from Jordan shortly after he had traveled there in August 2016. Significantly, Mr. Redzepagic had been interviewed by the Department of Homeland Security upon his return to the U.S. from Jordan and the interviewing agents concluded that there was "No sufficient evidence to determine subject supports Isis or any extremist groups at this time."

Over the course of February 2 and February 3, 2017, JTTF agents questioned Mr. Redzepagic - both at the Suffolk County Police Department and at an undisclosed hotel. These sessions were not recorded and were conducted at a time that Mr. Redzepagic's mental and emotional state was severely impaired by his drug addiction. In an affidavit submitted as an exhibit to Defendant's suppression motion, Mr. Redzepagic's mother, Sabina Redzepagic, described her son's drug induced disfunction as follows:

> "In February 2017, Elvis continued to struggle with his drug addiction problems, and additionally was unable to watch television as he claimed that people's mouths were being manipulated, and furthermore Elvis would randomly blurt out

> inappropriate language, and would claim that he was hearing and
> seeing things that others present could not see or hear.
> On February 2, 2017, I called the police to intervene, as Elvis was
> under the influence of drugs and was unexplainably throwing
> things around the house and damaging the house
> On February 21, 2017, I called the police to intervene as Elvis,
> under the influence of drugs, was cutting off his tatoos with a
> knife."

Indeed, medical records from Stonybrook University Medical Center confirm that Elvis was brought by police to the psychiatric emergency room on February 21, 2017 because he was found to be trying to cut off his tattoos with a knife (See: **Report of February 21, 2017 Stonybrook Psychiatric Exam attached as Exhibit B**).

Mr. Redzepagic also submitted an affidavit in support of suppression motions filed in this case in which he stated that throughout the months of January and February 2017 leading up to his arrest on March 3, 2017, "I abused drugs on a daily basis including marijuana, ecstasy, Xanax, valium, heroin and cocaine." He also stated in the affidavit that his thought processes and ability to listen and understand were impaired by drugs when he spoke with government agents in February and March, 2017.

It is readily apparent from viewing the videotape of Mr. Redzepagic's interrogation by the JTTF on March 3, 2017 that he was experiencing drug withdrawal and was behaving and speaking erratically.

On March 4, 2017, Mr. Redzepagic was arraigned on a criminal complaint and was subsequently indicted on two separate counts of §18 U.S.C. 2339A(b), Attempt to provide material support for a foreign terrorist organization. The substance of the allegation in Count One was that, between the months of June and August 2015, he had attempted to travel through Turkey to Syria to join a terrorist organization, namely ISIS or Al-Nusra Front. Count Two accused him of attempting to achieve the same goal by traveling through Jordan to Syria in September to October, 2016.

On April 23, 2021, Mr. Redzepagic pled guilty before Hon. A. Kathleen Tomlinson to Count One of the Indictment and admitted that in July 2015 he had attempted to travel to Syria via Turkey for the purpose of joining the Al-Nusra front.  2

---

2  In plea negotiations, the Government agreed to dismiss Count 2 pertaining to Jordan and recommended inclusion

Mr. Redzepagic remains adamant that when he traveled to Jordan in 2016, he did so for the purpose of learning Arabic and had no intention of Traveling from Jordan to Syria or anywhere else and had no intention at that time of joining any organization or group.

While Mr. Redzepagic admits that he attempted to travel to Syria in 2015 for the purpose of joining Al-Nusra, much (indeed most) of what he admitted to in his JTTF videotaped interview is utterly unreliable and should not be credited by the Court as it pertains to determining a just and appropriate sentence. In addition to the fact that he visibly appeared to be heavily under the influence of drugs and that he repeatedly informed the agents that he was high and/or withdrawing from drugs, much of the substance of what Mr. Redzepagic said to the agents was bizarre and detached from reality.

He told the agents that when he arrived in Turkey, it was a scary place and he could sense the devil right away. He said that "people were following him everywhere" and "everyone was pissing him off". See JTTF Video at approx. 1:26:46.

He told the agents that all the cab drivers (in Turkey) were so weird – everybody kept stopping and offering me cab rides. "I said you guys are pussies offering me cab rides – what do you want?"   JTTF Video at approx. 1:30:12.

He said "all over Turkey everyone hated me – not because I'm American – it was the devil." JTTF Video at approx. 1:32:20

While talking about his time in Montenegro before he flew to Turkey, Elvis said "Everybody turned on me, my whole family. It was weird. One of the nights I was praying. I got into a fight with my uncle. I didn't think it was him sneaking in my house. It was definitely the devil." JTTF Video at approx. 1:35:00.

He also said he was being bothered by Jinns: "The Jinns, I was seeing them, they bothered me straight up" JTTF Video at approx. 2:15:50.  3

Speaking again about his time in Turkey, he said that it was weird because half the people were enemies and half were neutral. He claimed that "on the radio, I'd be hearing stuff" and "I heard black magic on the speakers in the mosque". JTTF Video at approx. 1:38:50.

---

of a 168 month sentencing appeal waiver to indicate consensus that a sentence in excess of 168 months was not being recommended.
3  Jinns are supernatural spirits or demons in Islam.

The agents asked Elvis how he got from Istanbul to Adana and he answered: "They gave me free cab rides. It could have been Omar's people but I don't think so. It was random people. I would just get in" - JTTF Video at approx. 1:40:00. "I didn't tell the cabs I was going to Syria. I just got in" - JTTF Video at 1:44:35

When asked by the agents where was the airport from which he flew back to New York, Elvis pointed on the map of Turkey to the southern area around Adana clearly indicating that he believed he flew back from Adana - whereas flight records clearly show that his flight from Turkey to New York (via Frankfurt) departed from Sabina Gokchen airport in Istanbul. See JTTF Video at 1:45:00 to 1:48:30.

Even the JTTF agents seemed unconvinced by Mr. Redzepagic's account that he had traveled to Adana. They repeatedly expressed doubt about Elvis' claim that he had made it all the way to Adana (by way of free taxis) and they questioned him as to whether he was sure he was in Adana or whether he might have been in Istanbul the entire time. See JTTF at 1:57:00 to 1:58:10.

The defense does not contest that Mr. Redzepagic purposely missed his connecting flight in Istanbul on July 4, 2015 and that he wished to travel to Syria. However, the reality, borne out by cell site data and airline records, is that he never in fact left Istanbul and the journey to Adana he recounted to the JTTF agents on videotape was imagined.

## II. FACTORS TO BE CONSIDERED IN IMPOSING A SENTENCE – THE "3553 FACTORS"

The mandate of 18 U.S.C. §3553(a) is for the Court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing. Accordingly, pursuant to 18 United States Code § 3553(a) (the "3553 factors") and the holdings in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), and its progeny, we respectfully urge this Honorable Court to consider the 3553 factors, specifically Mr. Redzepagic's complex history and characteristics, his unique background and family ties, in fashioning a sentence that is sufficient but not greater than necessary to comply with the goals of sentencing. That sentence, we respectfully submit, is time served.

## III. FAMILY HISTORY AND PERSONAL CHARACTERISTICS OF THE DEFENDANT

Elvis Redzepagic is an intelligent 30 years old young man, born in Queens, New York

and raised in Brooklyn and Comack, Long Island. Mr. Redzepagic is the eldest of four children born to Sefket Redzepagic, age 55, and Sabina (nee Handanovic) Redzepagic, age 49. Two of Elvis' siblings, Adel Redzepagic, age 29, and Samir Redzepagic, age 27, are single and live at their parents' residence in Queens, New York. Both Adel and Samir are employed as doormen in New York City. Another sibling, Enisa Gacevic, age 28, is a homemaker and resides with her husband and two children in Brooklyn. PSR¶ 44.

### Early Life

Mr. Redzepagic grew up in the Sheepshead Bay area of Brooklyn until approximately age 14 when he moved to Comack, Long Island. He consistently received good grades throughout middle school and his early high school years. He was a member of his Sheepshead Bay Magnet Middle School chess team which achieved much success at regional and national competitions. See Exhibit A.1. – Letter of Sabina and Sefket Redzepagic. When his family moved to Long Island, Elvis found it more difficult to fit in comfortably with his peers. At first, he suffered from bullying but he continued to pursue positive activities such as playing sports and continuing to be a diligent student. See: Exhibit 3 – Page 3. However, by the time of his senior year in High School, he had aligned himself with a group of young people that were more focused on partying, drinking and using drugs than they were in schoolwork or other positive pursuits. See Exhibit A – Letters no. 1,2,3,5,6 & 8.

### Mr. Redzepagic's Drug Addiction

By the time he reached his late teens, Mr. Redzepagic was already a daily user of drugs and alcohol. PSR¶46. Over the next several years, his substance abuse problems progressively deepened. In his late teens, he was drinking approximately a bottle of liquor a day in addition to consuming large amounts of Xanax, oxycodone and marijuana. By age 20, he was consuming approximately 50 30mg pills of oxycodone daily and by aged 21 he had begun using heroin due to the diminishing high he was getting from oxycodone. See PSR ¶ 63. Before long, he was using one to two bundles of heroin a day and this usage continued, with some very brief gaps, up to the time he was arrested in regard to this case. PSR¶63

Between the ages of 19 and 25, Mr. Redzepagic was enrolled by his family in several outpatient and inpatient substance abuse programs including Road to Recovery Residential Treatment Center in Margate, Florida and Passages Malibu, a residential treatment center in California. Mr. Redzepagic managed to achieve very brief periods of sobriety while attending such programs but relapsed quickly thereafter. PSR¶64. At various times, Mr. Redzepagic has been treated with Methadone (a medication used to treat narcotic drug addiction), Suboxone (a narcotic used to help prevent addiction to narcotic pain relievers) and Vivitrol (a medication used to help prevent relapse into alcohol or drug abuse). See Exhibit 3, Pg. 8, first paragraph. He has also overdosed on multiple occasions.

By 2015, Mr. Redzepagic was an unemployed college dropout, addicted to several substances, unable to hold down a job and in constant conflict with his family on whom he was entirely financially dependent. To put it bluntly, his life was a mess. By this time, he had already failed in several drug addiction rehabilitation programs, including ones his family had paid substantial sums of money to enroll him. In the summer of 2015, Elvis' mother, Sabina, arranged for Elvis to travel to Montenegro to stay in a family-owned house in Plav, the town where Elvis' father, Sefket, grew up and where several extended family members still lived. Sabina thought that a month or two in Montenegro would get Elvis way from his drugged-out friends and associates in New York and would give him an opportunity to reflect on how he intended to turn his life around. She also admits that she and the rest of the family needed to get him out of the family home as his drug addiction was a very destructive force. Sabina's efforts were unsuccessful as Elvis continued to use drugs in Montenegro, and his already drug damaged mind seemed to deteriorate even further.

When it became apparent to Elvis' parents that he was deteriorating rather than healing in Montenegro, they booked a flight for him to return to New York. The flight they booked was from Plav to New York with a brief (70 minute) stopover in Istanbul. Mr. Redzepagic missed the connecting flight to New York and has admitted by his guilty plea that he did so intentionally so that he could travel through Turkey to Syria to join the Al-Nusra front.

Mr. Redzepagic remained in Turkey for 6 days. On the morning of July 10, 2015, he boarded a flight at Sabina Gokchen International Airport in Istanbul to New York via Frankfurt. The flight was booked and paid for by Mr. Redzepagic's mother.

Following his arrival back in New York, Mr. Redzepagic continued his drug addicted life. He persisted in using large quantities of multiple drugs and alcohol daily and he accidentally overdosed on multiple occasions including in a Dunkin Donuts Bathroom in mid 2016 and a similar overdose a couple of months prior. See Exhibit 3, Pg. 7. On February 21, 2017, Mr. Redzepagic was admitted to the Stony Brook University Medical Center Psychiatric Emergency Room after being brought there by police when his family reported that he was attempting to remove tattoos from his arm with a knife. See Exhibit 3, Pg. 7.

It should be noted that there is absolutely no evidence that Mr. Redzepagic contacted or attempted to contact any terrorist or extremist organizations while living in New York between the time of his return from Montenegro/Turkey in July 2015 and his arrest in March 2017. The Government has alleged that his trip to Jordan in 2016 was motivated by an intention to travel to Syria but no evidence has been provided in support of such a theory. Specifically, no evidence has been provided that he contacted any individuals or organizations in Jordan or Syria indicating an intention to travel to Syria nor has any evidence been provided of any steps taken or arrangements made to travel to Syria from Jordan.

During the competency exam conducted for this case by Samantha E. DiMisa, Ph.D. in February through April, 2020, Mr. Redzepagic told Dr. DiMisa that he felt "ashamed' and "terrible" about his substance abuse due to the burden it had imposed on his family and the "terrible example" it presented to his siblings. He expressed regret that his addiction had contributed to his failed marriage and expressed remorse for the "emotional abuse" he had inflicted on his family. (See: Exhibit C)

In the "DIAGNOSIS AND CLINICAL FORMULATION" section of her report, Dr. DiMisa wrote:

> Given Mr. Redzepagic's history and current presentation, he appears to meet criteria for the following diagnoses:
> - Alcohol Use Disorder, Severe, in Sustained Remission, in a Controlled Environment.
> - Opioid Use Disorder, Severe, in Sustained Remission, in a Controlled Environment.

- Sedative, Hypnotic. Or Anxiolytic Use Disorder (Xanax), Severe, in Sustained Remission, in a Controlled Environment.
- Stimulant Use Disorder (Crack Cocaine), Severe, in Sustained Remission, in a Controlled Environment.
- Cannabis Use Disorder, Severe, in Sustained Remission, in a Controlled Environment.
- Stimulant Use Disorder (MDMA), Severe, in Sustained Remission, in a Controlled Environment.

In the "PROGNOSIS" section of her report, Dr. Misa wrote:

"Mr. Redzepagic did not require and was not treated with any psychotropic medication during the current evaluation period. He has a remote history of symptoms of paranoia and a reported experience of auditory hallucinations, although it appears these symptoms were likely substance-induced and have since resolved, without the need for medication treatment. Mr. Redzepagic primarily presented as euthymic and well-related with positive affect. Mr. Redzepagic has a significant history of substance abuse. Mr. Redzepagic would likely benefit from continued substance abuse treatment. He has expressed interest in psychotherapeutic substance abuse treatment as well as medication-assisted treatment, the latter of which is currently under review at the Federal Bureau of Prisons. Given the above information, Mr. Redzepagic's prognosis is fair."

IV. <u>IMPACT OF SUBSTANCE ABUSE ON MR. REDZEPAGIC's LIFE AND CORRELATION WITH OFFENSE CONDUCT</u>

It is submitted that at the time of the charged conduct, Mr. Redzepagic's perception judgment and decision making were heavily impaired by his extreme and longstanding substance abuse and addiction. It is further submitted that his history of depression, anxiety, hearing imagined voices, and even sometimes seeing imagined images contributed to a general detachment from reality and an inability to make rational decisions. It is not at all surprising that Mr. Redzepagic did not come close to achieving his half-baked plan of traveling to Syria. Furthermore, it is virtually inconceivable that, should he somehow have made it to Syria, that he would have actually been able to connect with the Al-Nusra front or similar organization or that he would have been able to convince them to accept him as a member. Essentially, Mr. Redzepagic's goal of travelling to Syria to join Al-Nusra was a drug fueled pipedream that had

extremely little chance of becoming reality. Indeed, his perception of his efforts was so removed from reality that he recounted to the JTTF agents a fantastical story of traveling from Istanbul to Adana, an approximately 600 mile journey, by free taxi cabs and then flying back from an airport near Adana to the United States, whereas, in reality, the cell site geolocation data obtained from Mr. Redzepagic's cell phone show that he never left the greater Istanbul area and flight records show that his flight back to the United States was from an airport in Istanbul (Sabina Gokchen International Airport).

It should also be pointed out that while Mr. Redzepagic was in Turkey, his mother, Sabina, contacted the United States Consulate in Istanbul by phone and email asking for assistance in locating her son who "does not sound right", "sounds very confused" and "doesn't know where to go." (Sabina's email to the U.S. Consulate dated July 8, 2015 is attached as **Exhibit D**).

Mr. Redzepagic's conduct has been driven and influenced by mental dysfunction caused by extreme substance abuse coupled with anxiety and depression. His addiction and dysfunction is a fair consideration when comparing his conduct to others (other defendants facing similar charges) who act in a far more calculated way.

The Government, in its sentencing memorandum, cited several cases where defendants have received maximum sentences of fifteen to twenty years for similar charges. However, Mr. Redzepagic's case is demonstratively different from all of these cases.

Mr. Redzepagic never planned any terrorist attacks, nor did he ever speak to anyone about committing violent terrorist acts. He never indicated that, if ordered to do so, he would kill or hurt anyone. He never purchased weapons or modified magazine rounds. He never distributed terrorist propaganda, and never tried to recruit others to terrorist organizations. Mr. Redzepagic never gave money to a terrorist organization nor did he ever speak to a confidential informant or undercover agent about an intention to commit terrorist acts in the United States or elsewhere.

The factor that most distinguishes Mr. Redzepagic's case from others is his extreme addiction related dysfunction leading up to and at the time of the charged offense. He was a deeply troubled young man experiencing much difficulty staying connected to reality and his efforts to join a prohibited organizational were more delusional than real. It is respectfully submitted that Mr. Redzepagic's case is utterly unique due to the level of his delusions and the degree to which his efforts at providing support to a prohibited organization were so far distant from any likelihood that he ever would have actually been able to provide real support.

VI.   APPLICATION OF THE § 3553 FACTORS TO MR. REDZEPAGIC'S CASE

Mr. Redzepagic's uniquely troubled history and background are highlighted in order to move this court to fashion a sentence that is fair and just while allowing for Mr. Redzepagic to become rehabilitated, an important sentencing goal. In Mr. Redzepagic's case, it is "the nature and circumstances of the offense" as well as "the history and characteristics of the defendant" that justify a lesser sentence. 18 U.S.C. §3553(a)(1).

Mr. Redzepagic has admitted that in July 2015, he attempted to provide material support to a foreign terrorist organization in that he attempted to travel to Syria via Turkey for the purpose of joining the Al-Nusra Front. Obviously, Mr. Redzepagic has pled guilty to a very serious charge, one for which the court has discretion to impose a very severe sentence.

It is submitted, however, that the court also has wide discretion to impose a less severe sentence aimed at rehabilitation. There exist several factors that weigh in favor of rehabilitation over further punishment, most notably Mr. Redzepagic's extreme drug addiction and related mental dysfunction, the fact that he did not commit or attempt to commit any acts of violence and that there is no evidence that he has ever expressed support for any acts of violence in the United States or elsewhere or that he has supported any extremist or prohibited organizations within the United States.

Of course, of the goals set out in 18 U.S.C. § 3553(a)(2), the Government and surely the Court also must consider carefully the need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(2).

We submit that the sentence recommended by the PSR, is excessively long and harsh and does not serve the interests and goals set forth under the 3553 factors. While we are in no way minimizing the seriousness of the crime to which Mr. Redzepagic has pled guilty, we must point out that his actual conduct was delusional and ineffectual and was much more likely to result in harm to Mr. Redzepagic himself than to pose a real danger to anyone else.

Mr. Redzepagic has served a substantial amount of time in prison since his arrest on this

case. By the time of his sentencing on October 6, 2021, he will have served over 54 months. This is a significant period of incarceration and considering that much of this time was served under conditions of isolation and restriction due to the Covid-19 pandemic, his confinement has been more severe and seems much longer than it would have been under more normal circumstances. Mr. Redzepagic has been separated from his family, all of whom, as attested in their letters to the Court, have remained unwavering in their love and support. Mr. Redzepagic understands that he has made a grave mistake and that his life had been heading in a dangerous and misguided direction. The past few years of confinement combined with sobriety has provided him with an opportunity to reflect on the self-destructive trajectory of his life and on how his conduct negatively impacted others. He has made clear to everyone in his life that he is accountable and accepts responsibility for his conduct – a vital step demonstrating rehabilitation: quote from letters

     Mr. Redzepagic accepts responsibility for his conduct and understands that punishment is in order. However, he asks the court to consider his longstanding addiction as well as his strong desire to overcome his addiction and to live a peaceful and productive life. He expressed in his pre-sentence interview that he "definitely" wants to be part of a drug treatment program including programs available through the Bureau of Prisons. PSR ¶ 65.

     An important consideration in 18 U.S.C. §3553(a) is that of providing the defendant "with needed . . . medical care or all other corrective treatment in the most effective manner." As we have discussed extensively above, Mr. Redzepagic's drug addiction and mental health issues call for careful and sustained attention and treatment. The defining force in Mr. Redzepagic's young adult life has been his drug addiction and curing his addiction is the key to his being able to achieve a worthy and productive future. Imposing a lengthy period of incarceration on Mr. Redzepagic will not contribute in any way to rehabilitation, an important sentencing goal. Mr. Redzepagic is keenly aware that his addiction and unaddressed mental health issues have brought him to a dangerous place in his life where his ability to achieve a happy and productive future is gravely threatened. Mr. Redzepagic knows that he needs sustained substance abuse and mental health treatment to help him overcome his addiction and live a good life. He has remained sober while incarcerated. PSR¶ 65. As a result, he has been drug and alcohol free for over 4 ½ years and he is determined that, if given a chance, he will avail of all available treatment, help and

support to maintain his sobriety. Under the guidelines, the Court may substitute community confinement, such as home detention, or residence in a community treatment center, halfway house, or similar residential facility for imprisonment, U.S.S.G. §§ 5C1.1(e)(2) and (3).

Accordingly, and for all of the above-discussed reasons, we respectfully urge the Court to exercise its wide and great discretion and take into account Mr. Redzepagic's extremely dire and self-destructive addiction and sentence him to a term of incarceration of 72 months with a recommendation that he complete the remainder of his sentence a Bureau of Prisons Facility that provides intensive drug treatment. Assuming that by the time of his release, Mr. Redzepagic will have already undergone intensive substance abuse treatment, we would ask the court to impose a period of post release supervision no greater than 36 months.

## CONCLUSION AND REQUEST

Even when the Sentencing Guidelines were mandatory, sentencing courts were to treat those before them as individuals. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). The decision in *Booker* and the command of the statute to impose a sentence that is "sufficient, but not greater than necessary," has given sentencing courts greater latitude to impose a sentence that fits the crime and the person before the court. Mr. Redzepagic's uniquely troubled background, his longstanding addiction and related mental health issues, warrant a sentence tailored to his individual circumstances. Thus, we respectfully ask this Court to exercise its discretion and to sentence him to a sentence reflective of his character, history and circumstances, and to sentence him to a period of incarceration of 72 months plus a reasonable period of post release supervision.

WHEREFORE, it is respectfully requested that the Court take note of all of the information provided herein, and sentence defendant accordingly.

RESPECTFULLY SUBMITTED


September 29, 2021
New York, New York

*/s/ David Roche*

David Roche, Esq.
*20 Vesey Street, Suite 1400*
*New York, NY 10007*
*Tel: (212) 349-0300*
Email: david@ahmadroche.com


*/s/ Hassan Ahmad*
Hassan Ahmad
*20 Vesey Street, Suite 1400*
*New York, NY 10007*
*Tel: (212) 349-0300*
Email: hassan@ahmadroche.com

cc:     AUSA Artie McConnell & AUSA Saritha Komatireddy (*by email*)